J-S41011-16

2016 PA Super 214

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN GREEN | |
| Appellant | No. 2672 EDA 2014 |

Appeal from the Judgment of Sentence Entered September 12, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011053-2013

BEFORE:  BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:　　　　　　　　**FILED SEPTEMBER 16, 2016**

Appellant Kevin Green appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on September 12, 2014, following a jury trial at which time he received an aggregate term of fifty-five (55) years to one hundred ten (110) years in prison for his convictions of robbery, two counts of kidnapping, conspiracy, two counts of false imprisonment, burglary, and theft by unlawful taking.[1]  Appellant challenges the sufficiency of the evidence to sustain his kidnapping convictions, the legality of his sentences for false imprisonment, and the trial court's denial of his request to represent himself at his jury trial.  After careful review, we affirm.

_____

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 2901(a)(1), 903, 2903(a), 3502(c)(1), and 3921, respectively.

*Former Justice specially assigned to the Superior Court.

The trial court aptly set forth the relevant facts herein as follows:

In August of 2013, Elizabeth Varela, her husband José Torres, and their son Joshua Torres lived at 3540 North Fifth Street, Philadelphia. Joshua, who was twelve years old at the time of the incident, is autistic. Ms. Varela and Mr. Torres own rental properties in the North Philadelphia area. On August 10, 2013, Appellant and a woman came to their house on Fifth Street. When they knocked at the door, Ms. Varela answered, and the woman asked for Mr. Torres. Without being invited inside, both individuals entered the home. They said they were there to see the rental property, and were told the available rental property was actually on Sixth Street. The two individuals asked to go upstairs in Ms. Varela's home, but were told there were no apartments there. The two then left with Mr. Torres to view the rental property on Sixth Street.

When Mr. Torres took the two individuals to the apartment on Sixth Street, they asked how soon it could be ready. Mr. Torres told them that a tenant had just moved out, but he could get it cleaned up in about an hour. Appellant then told Mr. Torres that he would go get money, and bring it back to the apartment while Mr. Torres remained there to clean up. Mr. Torres testified that Appellant and the woman never returned to the apartment.

About an hour after her husband had left, Ms. Varela was at home with her son and heard the door open. Appellant and his female companion had entered through the front door, which was closed but unlocked at the time. Ms. Varela asked them why they were there, and the woman told her that they were waiting for Mr. Torres to return so they could sign a lease. Ms. Varela found this strange because they never signed leases at their own home. Ms. Varela said she would call her husband, at which point Appellant took a black gun out of his waistband. He pushed her and "started cursing and asking for the money." Appellant placed the gun against Ms. Varela's temple and continued to demand the money. He then began asking where Ms. Varela's son was; she lied and told him her son was not in the house. Appellant then went upstairs and told the woman to watch Ms. Varela. Ms. Varela pushed the woman away and ran upstairs to protect her son.

In one of the upstairs rooms, Appellant was pushing Joshua Torres and pointing the gun at him. He continued to ask

- 2 -

for the money, but Joshua did not respond. Joshua called for his mother, who tried to pull him away from Appellant. While holding Ms. Varela and her son at gunpoint, Appellant continued to search around the room for money. He looked through drawers and shelves in the room. On one shelf was a pair of black pants with money inside them. Appellant put the pants under his arm and asked where the rest of the money was. He said it must be downstairs and started to push Joshua down the stairs. Ms. Varela tried to get between them and told him not to push her son.

When they were downstairs, Appellant continued to ask where the money was, and started asking about a safe. Ms. Varela testified that although the family owned a safe, it was new and they had not yet opened it. Appellant then used a gray tie strap to bind her wrists together. The woman took Joshua to the basement and found the safe. When she told Appellant about the safe in the basement, he began asking for the combination. Ms. Varela told him she did not know the combination, but it was in the pamphlet that came with the safe. Appellant then kicked her, causing Ms. Varela to fall to the floor. They put Ms. Varela's hands behind her back and started to tie her son up with her. At this point, the woman opened the front door and said to Appellant "we need to go now." Appellant took the pants with him and they both ran out the door. Ms. Varela testified that Appellant had taken the pants with the money, while the woman took her phone. When Mr. Torres returned to his home, he found his wife and son tied up, and his son was crying.

The Torres family's neighbor, Ronald Martin, observed Appellant and a woman fleeing the Torres' home as he was heading to the store. Mr. Martin called the police and went to assist the Torres family. When the police arrived, Mr. Martin gave a description of the couple and stated in which direction he had seen them running. After the suspects were apprehended by police, Mr. Martin identified them as the individuals who had fled the Torres' home.

A radio call went out regarding the robbery and descriptions of the suspects were given to police in flash information. Officer Michael Edwards and his partner, Officer Ortiz, patrolled the area for individuals matching the description. Travelling eastbound on Allegheny Avenue, Officer Edwards observed Appellant walking westbound on the sidewalk,

matching the description of the suspect. When Appellant saw the officers, he started to run, and Officer Edwards began chasing him on foot. Appellant was carrying a bundle and tossed it aside as he was running. It was later retrieved and identified as a pair of pants with a large amount of cash in the pocket. Appellant was apprehended by Officer Edwards and placed under arrest.

Mr. Torres testified that he has been in the rental business for about 30 years. He has about twelve rental properties in North Philadelphia. Mr. Torres testified that he received rent payments in cash, because he'd had problems with bad checks before, and generally kept that money in his house. There was $7,713 in cash taken from the house that day.

Trial Court Opinion, filed 5/1/15, at 3-6 (citations to the Notes of Testimony omitted).

Pertinent to this appeal, Appellant's aggregate sentence included two consecutive terms of ten (10) years to twenty (20) years in prison for his kidnapping convictions, a consecutive term of four (4) years to eight (8) years' incarceration for the false imprisonment conviction pertaining to twelve-year-old Joshua Torres, and a consecutive term of one (1) year to two (2) years in prison for the false imprisonment conviction pertaining to Elizabeth Varela (hereinafter collectively "the victims").

Appellant timely filed a notice of appeal and complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court filed its Rule 1925(a) opinion on May 1, 2015. In his appellate brief, Appellant presents the following three issues for our review:

I. Was the evidence insufficient to support Appellant's two convictions for kidnapping, as a matter of constitutional law?

- 4 -

II. If Appellant's convictions for kidnapping were to stand, would not the sentences imposed for false imprisonment be illegal under the Double Jeopardy Clause, since the crime of false imprisonment merges with the crime of kidnapping?

III. Did the trial court err in refusing to permit Appellant to represent himself at trial, thus depriving him of his constitutional right to self-representation, as well as his rule-based right under Pa.R.Crim.P. 121?

Brief for Appellant at 3.

In considering Appellant's initial contention the evidence was insufficient to support his kidnapping convictions, we begin with our standard of review:

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.
> However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and

speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Ovalles*, 2016 WL 4035999, at *8-9 (Pa.Super. July 25, 2016) (citation omitted).

Appellant was convicted of kidnapping the victims.[2] To sustain a conviction for those crimes, the Commonwealth needed to prove the following:

> **(a) Offense defined.--** Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>
> > (1) To hold for ransom or reward, or as a shield or hostage.
> >
> > (2) To facilitate commission of any felony or flight thereafter.
> >
> > (3) To inflict bodily injury on or to terrorize the victim or another.
> >
> > (4) To interfere with the performance by public officials of any governmental or political function.
>
> **(a.1) Kidnapping of a minor.--**A person is guilty of kidnapping of a minor if he unlawfully removes a person under 18 years of

---

[2] We note that while the Criminal Complaint charged Appellant with the crime of kidnapping generally, Counts 2 and 10 of the Criminal Information specifically alleged Appellant kidnapped the victims with the intent to hold them for ransom. However, the trial court's jury charge pertained to kidnapping with the intent to facilitate a felony. N.T. Trial, 7/10/14, at 166-68. In light of this, Appellant indicated in his appellate brief he has not presented any issues "relating to asportation, ransom, reward, shield or hostage." *See* Brief for Appellant at 19 n. 5.

age a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines a person under 18 years of age for a substantial period in a place of isolation, with any of the following intentions:

> (1) To hold for ransom or reward, or as a shield or hostage.

> (2) To facilitate commission of any felony or flight thereafter.

> (3) To inflict bodily injury on or to terrorize the victim or another.

> (4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S.A. §§ 2901(a), (a.1).

The primary basis for Appellant's sufficiency challenge is his contention the Commonwealth failed to prove he confined the victims for a substantial period in a place of isolation. This Court has stated "what is a 'substantial period' in time can depend on the mental state of the victim. The fright that can be engendered in 30 minutes can have the same debilitating effect on one person as 30 hours may have on another." *Commonwealth v. Hughes*, 399 A.2d 694, 698 (Pa.Super. 1979). When considering what qualifies as confinement in a place of isolation, this Court has held:

> the concept is "not geographic isolation, but rather effective isolation from the usual protections of society." *Commonwealth v. Mease*, 357 Pa.Super. 366, 516 A.2d 24, 26 (1986) (citation omitted). "[O]ne's own apartment in the city can be a place of isolation, 'if detention is under the circumstances which make discovery *or rescue* unlikely.'" *Commonwealth v. Jenkins*, 455 Pa.Super. 152, 687 A.2d 836, 838 (1996) (quotation omitted) (emphasis in original) (holding that the appellant isolated the victims where he entered the victims' home and held the child victim at knifepoint when police arrived). The requirement that the victim be confined in a place of isolation does not require

- 7 -

that the victim be left alone; the fact that other people are present does not necessarily negate the victim's isolation from the usual protections of society. *See Mease, supra* (holding that where the appellant confined the victim in the appellant's basement, and appellant's friends were present, the evidence was sufficient to demonstrate isolation for kidnapping purposes).

*In re T.G.*, 836 A.2d 1003, 1008 (Pa.Super. 2003).

Appellant maintains he did not confine the victims to a place of isolation for a substantial period as required by 18 Pa.C.S.A. §§ 2901 because their confinement was incidental to the robbery itself. *See* Brief for Appellant at 21-23 *citing Commonwealth v. Hook*, 512 A.2d 718 (Pa.Super. 1986) (holding that while an hour may constitute a substantial period, evidence was insufficient to establish the appellant confined his victims in a place of isolation where the victims' apartments were frequented both by relatives and business contacts, a business was located directly beneath the victims' apartments, and an employee from the business was expected momentarily). Appellant stresses that throughout the entire incident, the victims' home was unlocked, they were free to move about because "at worst, it was only their hands which were bound[,]" and help arrived within minutes after Appellant and his cohort fled, demonstrating that the circumstances were not such that their discovery was unlikely. Brief for Appellant at 25-26. We disagree.

In *Commonwealth v. Rushing*, 627 Pa. 59, 99 A.3d 416 (2014), our Supreme Court detailed prior caselaw wherein the definition of "a place of isolation" as it pertains to the crime of kidnapping was analyzed as follows:

Based upon the statutory language, the history of the crime of kidnapping, the Model Penal Code on which Section 1209(a) is based, and our Court's decisions interpreting the kidnapping statute, we take this opportunity to reaffirm that, for purposes of Pennsylvania's kidnapping statute, a "place of isolation" is not geographic in nature, but contemplates the confinement of a victim where he or she is separated from the normal protections of society in a fashion that makes discovery or rescue unlikely.

Our Commonwealth's courts have consistently applied this definition to disparate circumstances, in varied challenges to convictions under the kidnapping statute. For example, and as noted above, in **[Commonwealth v.]***Housman*[,604 Pa. 596, 986 A.2d 822 (2009)] and **[Commonwealth v.] Markman**,[591 Pa. 249, 916 A.2d 586 (2007)] which both arose in the context of the same underlying circumstances, our Court concluded the place-of-isolation requirement was met when the victim was bound and gagged and left alone in the living room of a trailer, even though located in a busy trailer park in the early evening. Similarly, in **[Commonwealth v.] *Mease*,**[516 A.2d 24 (Pa.Super. 1986) the Superior Court determined that the defendant's basement constituted a "place of isolation" as the victim, being confined there for several hours, beaten, stabbed, and ultimately shot in the back of the head, had been confined where discovery and rescue were unlikely and isolated from the usual protections of society. 516 A.2d at 26. More recently, in **[Commonwealth v.] *Jenkins*,**[687 A.2d 836 (Pa.Super. 1996)] the Superior Court concluded that the victims were confined in a place of isolation from rescue and the protections of society where a 70–year–old woman and her 4–year–old great-grandson were held at knifepoint inside the grandmother's home for five hours, police had surrounded the residence, the victims were unreachable and locked inside the home, and the fate of both victims was exclusively in the hands of the defendant.

These decisions can be contrasted with the circumstances in **[Commonwealth v.] *Hook*,**[512 A.2d 718 (Pa.Super. 1986)] in which the victim, who resided in an apartment located above a clothing store, opened the door expecting a dry cleaning delivery, but, instead, was confronted by the defendant. After the defendant threatened to rape the initial victim, placed his hand over her mouth, told her to be quiet, and following a brief struggle, she was able to escape from her assailant and enter an

elderly neighbor's apartment, but was caught by the defendant. The defendant threw both women onto a bed and again verbalized his intent to rape the first victim, but passed out due to intoxication before being able to act upon his threat.

The Superior Court in **Hook** determined the evidence was insufficient to prove confinement in a place of isolation, as the defendant's presence outside the victim's apartment made it clear there was open access to the area, the one victim was expecting a delivery from a dry cleaning service, the victims' apartments were frequented by business associates and relatives, an open business was located beneath the apartments, and the police arrived at the scene three minutes after receiving a telephone call from the clothing store. 512 A.2d at 720. The Superior Court, therefore, determined that the mode of confinement did not render discovery or rescue of the victims unlikely, and found that the confinement was incidental to the underlying offense of attempted rape.

While the circumstances before the above tribunals are obviously disparate, the degree of isolation from discovery and rescue and the usual protections of society remain the touchstone in determining whether the statutory element of confinement in a place of isolation is satisfied. Applying the facts of this appeal to the definition of place of isolation, we have no hesitancy in determining that, although imprisoned in their own home, the victims were confined by Appellee in a place of isolation.

**Rushing**, 627 Pa. at 74–75, 99 A.3d at 425–26. In **Rushing**, our Supreme Court ultimately held that the confinement of the victims was not merely incidental to the other crimes committed where the victims had been tightly bound in their own home and rendered unable to leave the premises or seek rescue while other victims were murdered therein.

In the matter *sub judice*, the evidence when viewed in a light most favorable to the Commonwealth as verdict winner reveals that Appellant bound the hands of the victims in their home while he and his cohort swore

at them, held a gun to their heads, and pushed and shook Joshua while ordering the child and Ms. Varela to tell him where the money was. N.T. Trial, 7/9/14, at 64-67, 70. Before tying Ms. Varela's hands behind her back, Appellant kicked her in the stomach causing her to fall to the floor. *Id*. at 71. After taking thousands of dollars, Appellant fled the premises, leaving the victims bound in the home. *Id*. at 72. Appellant also took Ms. Varela's phone from her at the outset in an effort to prevent her from calling for assistance. *Id*. at 73.

Appellant posits the facts of *Hook*, *supra*, concerned a "similarly insubstantial and incidental confinement of the victims," which "together with the openness of the venue to rescue, precluded conviction of the defendant of kidnapping." Brief for Appellant at 22. Appellant stresses the fact that the victims' residence was located in close proximity to other houses and that the door was unlocked to support the proposition that the home was accessible to the public; however, the victims' private home in a residential neighborhood cannot be viewed as accessible to the public merely because the front door was unlocked while they were inside.[3] Also, Ms. Varela testified that she was not expecting visitors when Appellant entered

_____

[3] The front door was equipped with an alarm, and although it had been turned off at the time, it would have alerted the victims that someone had entered were it activated.

her residence uninvited and that she and her husband do not negotiate leases in their home. N.T. Trial, 7/9/14, at 58-63.

Moreover, while the victims' home was located in close proximity to others and Mr. Torres returned shortly after Appellant and his cohort left, this does not negate Appellant's vicious criminal acts, nor does the unlocked door require a finding that the victims were not isolated from any chance of outside discovery and aid. *See Houseman, Markman and Jenkins*, *supra*.

The last time the victims saw Mr. Torres, he was leaving to show Appellant and his cohort an apartment, and the time at which he was to return was unknown to them. In fact, Mr. Torres testified he returned when he received a phone call to do so. N.T. Trial, 7/9/14, at 123. In addition, he indicated to Appellant and his cohort that he would need about an hour to clean the apartment which the duo falsely expressed interest in renting. Therefore, when Appellant barged into the victims' home, he was operating under the assumption he had ample time to find the money stored there. As such, rather than being incidental to the robbery, Appellant's confinement of the victims was with the intent to commit crimes and to facilitate his escape. *See Rushing*, 627 Pa. at 77, 99 A.3d at 427.

In addition, rather than excuse Appellant's criminal behavior, the fact that Mr. Martin timely gained access to the home and rescued the victims

despite Appellant's blatant steps to prevent a prompt rescue so as to effectuate his felonies and flight may have saved their lives.

Appellant further claims that he did not immobilize the victims completely in that only their hands were tied and they had not been gagged or otherwise prevented from screaming for help. However, the victims were physically restrained and at times separated at gunpoint on different floors of their home. When Appellant initially confronted Joshua, the child was alone upstairs, and while Appellant tied Ms. Varela's hands behind her back with a plastic zip tie and beat her on the main floor, his cohort, armed with a gun, forced Joshua to the basement. N.T. Trial, 7/9/14, at 68-72, 107. Although her mouth was not covered, it is significant that Appellant prevented Ms. Varela from utilizing her phone to call for help. Indeed, Mr. Torres testified that he returned to find Ms. Varela's and Joshua's hands still bound with plastic ties. *Id*. at 123-26. In light of the foregoing, Appellant held the fate of the victims in his exclusive control until he and his cohort left the home and help subsequently arrived. *See Rushing*, *supra*, 627 Pa. at 76, 99 A.3d at 426.

Moreover, upon first seeing his wife, Mr. Torres remarked she was "scared" "terrorized" and "crying." N.T. Trial, 7/9/14, at 126. The traumatic circumstances especially affected Joshua who was "scared," "crying," left "paralyzed" and "shaking and crying." *Id*. at 91-92, 123, 125-26 151. Such acute distress clearly affected his ability to seek help for his mother and him,

and further confirms the victims were placed in significant fear for a "substantial period" in a "place of isolation" for purposes of the kidnapping statute. As such, we find the Commonwealth presented sufficient evidence to sustain Appellant's kidnapping convictions. *See* 18 Pa.C.S.A. § 2901(a), (a.1).

Appellant next posits his sentences for false imprisonment are illegal in that they should have merged with his sentences for the kidnapping convictions. "A claim that the trial court imposed an illegal sentence by failing to merge sentences is a question of law." ***Commonwealth v. Duffy***, 832 A.2d 1132, 1137 (Pa.Super. 2003). Accordingly, our standard of review is *de novo* and our scope of review is plenary. ***See Commonwealth v. Brougher***, 978 A.2d 373, 377 (Pa.Super. 2009).

At the outset, we note that Appellant did not raise this issue at the time of sentencing or in a post-sentence motion, but rather he asserted it for the first time in his Pa.R.A.P. 1925(b) statement; however, a claim of an illegal sentence based on merger of the underlying convictions cannot be waived. ***Commonwealth v. King***, 786 A.2d 993, 995 (Pa.Super. 2001). In this regard, the legislature has provided that:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765. "The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; *and* 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Commonwealth v. Baldwin**, 604 Pa. 34, 39, 985 A.2d 830, 833 (2009) (emphasis added). Under Section 9765, even if a single set of facts comprises both crimes, "if the crimes themselves can result in committing one without committing the other, the elements in general are different, and the legislature has said merger cannot apply." **Commonwealth v. Coppedge**, 984 A.2d 562, 564 (Pa.Super. 2009) (italics omitted).

We have reproduced the elements of the crime of kidnapping, *supra*, and the crime of false imprisonment is defined, in relevant part, as follows:

> **(a) Offense defined.--**Except as provided under subsection (b) or (c), a person commits a misdemeanor of the second degree if he knowingly restrains another unlawfully so as to interfere substantially with his liberty.
>
> **(b) False imprisonment of a minor where offender is not victim's parent.--**If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if he knowingly restrains another unlawfully so as to interfere substantially with his liberty.

18 Pa. C.S.A. § 2903.

Appellant contends that although the trial court's instructions to the jury properly related the statutory definitions of kidnapping and false imprisonment, the court erroneously determined that the crimes did not merge for sentencing purposes because a different *mens rea* is necessary for

- 15 -

each. Specifically, the trial court found that the false imprisonment statute requires an unlawful restraint to be undertaken "knowingly" while the kidnapping statute requires "intentional" acts. Brief for Appellant at 31 **See also** Trial Court Opinion, filed 5/1/15, at 18-20. Appellant cites to 18 Pa.C.S.A. § 302(a) and this Court's decision in **Commonwealth v. Nero**, 58 A.3d 802, 809 (Pa.Super. 2012) for the proposition that knowledge is a lesser included *mens rea* of intent. Brief for Appellant at 31-32. We further note the trial court also determined that because the crimes arose from the same criminal act, there was no issue before it as to the element of merger. Trial Court Opinion, filed 5/1/15, at 18.

Upon our review of the record, we disagree with the trial court's determination that the kidnapping and false imprisonment convictions arose from the same criminal act and that, therefore, there was no need to analyze merger, for "our legislature has determined that even if there is only a single criminal act, unless all of the statutory elements of an offense are included in the statutory elements of another offense, there is no merger under 42 Pa.C.S.A. § 9765. **See Coppedge**, **supra**, 984 A.2d at 565. We find that while Appellant's crimes occurred during the same criminal episode, he engaged in distinct acts that constitute separate crimes for which he was sentenced accordingly. In this regard, this Court's holding in **Commonwealth v. Pettersen**, 49 A.3d 903 (Pa. Super. 2012) is instructive:

> When considering whether there is a single criminal act or multiple criminal acts, the question is not whether there was a break in the chain of criminal activity. The issue is whether the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes.

*Id.* at 912 (quotations and citations omitted).

An examination of the Criminal Complaint, the Criminal Information and the evidence reveals that Appellant knowingly entered the victims' home armed and uninvited after which he deceitfully gained control over them with the guise of negotiating a lease to obtain full access to the residence and the cash stored therein. Thus, Appellant's substantial interference with the victims' liberty was effected upon Appellant's entry and the crime of false imprisonment was completed. 18 Pa.C.S.A. § 2903.

The kidnapping statute contains a time and space dimension in that it requires proof that the victims had been confined for a substantial period in a place of isolation. 18 Pa.C.S.A. 2901. As was discussed *supra*, the evidence established Appellant and his cohort beat, threatened, separated and held the victims at gunpoint. He confined them by force and threats of violence if they did not turn over their money by holding a gun to their heads and physically restrained them for a substantial period of time in a place of isolation by binding their hands and confiscating Ms. Varela's cell phone. Thus, Appellant committed multiple acts beyond what was necessary to establish the elements of either kidnapping or false imprisonment as to

- 17 -

both victims. *See Commonwealth v. Kitchen*, 814 A.2d 209, 215 (Pa.Super. 2002) (finding an appellant's convictions for sexual abuse of children for photographing sexual acts and for possession of child pornography did not merge because the act of taking the photographs was separate from the possession of them).

Appellant should not receive a "volume discount" for his crimes. *See Pettersen*, 49 A.3d at 912 (stating "Appellant is not entitled to a volume discount for these crimes simply because he managed to accomplish all the acts within a relatively short period of time"); therefore, we find the trial court did not err in finding that false imprisonment did not merge with kidnapping for sentencing purposes. *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 577 n. 4 (Pa.Super. 2005) (stating this Court may affirm the trial court on any valid basis).

Lastly, Appellant contends he is entitled to a new trial because the trial court erroneously denied him his Sixth Amendment right to represent himself. Within this issue, Appellant presents five subclaims:

A. The trial court utilized an improper standard for decision.

B. The trial court improperly deprived Appellant of his right to represent himself because of Appellant's insistence that the court-ordered mental competency examination be recorded.

C. The trial court improperly deprived Appellant of his right to self-representation on grounds of allegedly disruptive behavior.

D. The trial court incorrectly suggests that the foregoing constitutional analysis requires a showing of prejudice.

> E. The appropriate remedy should include restoration of Appellant's right to consider the Commonwealth's plea offer, as well as the right to represent himself at trial.

Brief for Appellant at 36, 38, 44, 51, 54 (unnecessary capitalization omitted).

Appellant's first and fourth subclaims attack the standard of proof applied by the trial court in its Rule 1925(a) opinion. Appellant does not contend, and the record does not reveal, that the trial court utilized a legally incorrect standard in actually ruling on Appellant's request to represent himself at the time that request was made. Moreover, our disposition of Appellant's third issue rests upon different grounds than that discussed by the trial court in its opinion. **See Wilson**, **supra**. Similarly, we will not address Appellant's final subclaim as it would be relevant only if we were to find that he is entitled to a new trial. As such, the focus of our discussion will be upon Appellant's arguments in support of subclaims B and C. To provide a frame of reference in which to do so, we necessarily summarize the procedural history surrounding Appellant's request to represent himself.

In October of 2013, the trial court appointed William J. Ciancaglini, Esq., to represent Appellant. In early November of 2013, Appellant filed a *pro se* motion for bail reduction, and a hearing was conducted on December 4, 2013. At that proceeding, the trial court initially informed Appellant that he could present motions and cautioned that he must do so only through his counsel. N.T. Hearing, 12/4/13, at 4. Appellant disregarded this directive as the proceeding progressed by attempting to litigate *pro se* motions

challenging the trial court's subject matter jurisdiction and the validity of the laws of this Commonwealth.  *Id.* at 14-18.  Appellant repeatedly ignored the trial court's instructions and denial of his claims and persisted in arguing his legal positions.  *Id.* at 17-19.  Appellant also continuously insisted that his attorney was not representing him and stated that he did "not consent to these procedures."  *Id.* at 19-20.  Appellant further accused the trial court of "arguing law from the bench…."  *Id.* at 20.

Near the end of the hearing, Appellant asked the trial court, "So you [*sic*] saying that I can't represent myself in my person, sir?"  *Id.* at 23.  The trial court replied that Appellant "may be able to represent [himself,]" but that the court must first determine if Appellant was "competent" to do so. *Id.*  The trial court informed Appellant it would conduct a hearing on January 10, 2014, to address the issue of Appellant's self-representation, and suggested that, in the meantime, Appellant consult with his counsel to clarify what may happen were he to choose to represent himself. *Id.* at 23-24. When the trial court attempted to conclude the hearing, Appellant again questioned the court's jurisdiction.  *Id* at 24.  Another lengthy exchange between Appellant and the trial court ensued, during which the court attempted to answer Appellant's questions about jurisdiction, despite Appellant's challenges to the court's responses.  *Id.* at 24-28.  Following this dialogue, Attorney Ciancaglini requested a psychiatric evaluation of Appellant, and the trial court ordered that such an examination should be

conducted before the January 10, 2014, hearing to determine if Appellant would be competent to represent himself at trial. *Id.* at 28-29.

The January 10, 2014, hearing was continued until February 19, 2014. Prior thereto, Appellant met with Dr. John S. O'Brien for his psychiatric evaluation. Notwithstanding, Appellant failed to cooperate with the evaluation and, as such, Dr. O'Brien was unable to issue an opinion regarding whether Appellant was competent to represent himself.[4] *See* N.T. Hearing, 2/19/14, at 2-3. The trial court again informed Appellant that if he still wished to represent himself, he would first have to cooperate with the psychiatric evaluation to determine his competency to do so before the court would conduct a colloquy to ascertain whether his desire to waive his right to counsel was knowing, intelligent, and voluntary. *Id.* at 5. Nevertheless, Appellant insisted that the trial court should question him without an evaluation; the trial court denied this request. *Id.* at 5-6.

Appellant then asked that his evaluation with Dr. O'Brien be recorded, but the trial court stated that, "we don't tape these sessions. [The doctor] takes notes and he writes up a report. That's the way it works." *Id.* at 7. In response, Appellant contended that the court lacked "subject matter jurisdiction" and was improperly "practicing law from the bench…." *Id.* at 7. Appellant concluded by stating that he was "not going to take part in this

_____

[4] Appellant does not challenge his competency to stand trial herein.

collusion that's going on…." *Id.* at 8. Later in the proceeding, Appellant again objected and argued that the laws were invalid because there was no "enactment clause." *Id.* at 11. The trial court attempted to explain to Appellant that it had jurisdiction and that the laws are valid, but Appellant continued to argue his contrary position and claim that the court was "practic[ing] law from the bench…." *Id.* at 11-14.

When Appellant then began arguing the merits of several *pro se* motions he had filed, the trial court reiterated that if he wanted to represent himself, he would have to cooperate with the psychiatric evaluation. *Id.* at 15-16. Appellant replied that if the evaluation was "not on record, [he would] not tak[e] part [in] this collusion…." *Id.* at 16. The proceeding ended with the following exchange:

> THE COURT: [Appellant], it's not going to be tape recorded. [The doctor is] going to take notes.
>
> So this is the question: Are you going to cooperate with Dr. O'Brien?
>
> [APPELLANT]: Sir, I'm not going to take part in these proceedings. I'm challenging subject matter jurisdiction, and I don't think that this Court has subject matter jurisdiction.
>
> THE COURT: [Appellant], you're not going to be able to represent yourself since you're challenging the subject matter jurisdiction and you're not agreeing to cooperate with Dr. O'Brien in having the evaluation. So Mr. Ciancaglini will be representing you at trial. If you change your mind --
>
> [APPELLANT]: Your Honor, I object to Mr. Ciancaglini representing me. He was ineffective at the preliminary hearing, and he's ineffective right now.
>
> THE COURT: You can raise all those issues on appeal, should you be convicted, for his ineffectiveness that you claim. But I'm

- 22 -

going to tell you something, [Appellant], so it's clear. If you want to represent yourself, you cooperate with Dr. O'Brien.

If you don't cooperate with Dr. O'Brien so I can get a psychiatric report … to help me determine whether you're competent to represent yourself, then Mr. Ciancaglini will represent you, and that's how we're going to proceed.

So if you decide you want to cooperate with Dr. O'Brien where he will take notes like he did in the session that he had with you and give me a report based on your answering all his questions, that's fine. If you're not going to do that, the trial date remains, and Mr. Ciancaglini will represent you.

[APPELLANT]: So, sir, you're just going to overrule my objection?

THE COURT: Yes.

…

[APPELLANT]: You're going to proceed with these proceedings and overrule my objections to lack of subject matter jurisdiction, sir?

THE COURT: Yes.

…

[APPELLANT]: I also have a stated habeas pending, too, sir, on these proceedings, too, challenging subject matter jurisdiction and your behavior.

THE COURT: So noted. See you in May for the motions and in June for the trial.

*Id.* at 16-19 (emphasis added). As stated previously, Appellant's jury trial was held in July of 2014, at which time he was represented by Attorney Ciancaglini.

Presently, Appellant avers that he had been denied his Sixth Amendment right to represent himself. We begin by acknowledging:

A criminal defendant's right to counsel under the Sixth Amendment includes the concomitant right to waive counsel's

- 23 -

assistance and proceed to represent oneself at criminal proceedings. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Commonwealth v. Szuchon*, 506 Pa. 228, 484 A.2d 1365 (1984). The right to appear *pro se* is guaranteed as long as the defendant understands the nature of his choice. *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525. In Pennsylvania, Rule of Criminal Procedure 121 sets out a framework for inquiry into a defendant's request for self-representation. Pa.R.Crim.P. 121. Where a defendant knowingly, voluntarily, and intelligently seeks to waive his right to counsel, the trial court, in keeping with *Faretta*, must allow the individual to proceed *pro se. See Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1335 (1995) (holding that a defendant must demonstrate a knowing waiver under *Faretta*). *See also Commonwealth v. McDonough*, 571 Pa. 232, 812 A.2d 504, 508 (2002) (concluding that *Faretta* requires an on-the-record colloquy in satisfaction of Pa.R.Crim.P. 121, which colloquy may be conducted by the court, the prosecutor, or defense counsel.)

The right to waive counsel's assistance and continue *pro se* is not automatic however. Rather, only timely and clear requests trigger an inquiry into whether the right is being asserted knowingly and voluntarily. *See Faretta*, 422 U.S. at 836, 95 S.Ct. 2525 (noting that the defendant sought to represent himself by way of a clear and unequivocal declaration asserted weeks before trial). *See also Commonwealth v. Grazier*, 552 Pa. 9, 713 A.2d 81, 82 (1998) (holding that a Rule 121 colloquy is required only in response to a timely and unequivocal invocation of the right to proceed *pro se*). Thus, the law is well established that "in order to invoke the right of self-representation, the request to proceed *pro se* must be made timely and not for purposes of delay and must be clear and unequivocal." *Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 438 (2005), *cert. denied*, 546 U.S. 1020, 126 S.Ct. 660, 163 L.Ed.2d 534 (2005).

*Commonwealth v. Smith*, 69 A.3d 259, 266 (Pa.Super. 2013) (quoting

*Commonwealth v. El*, 602 Pa. 126, 977 A.2d 1158 (2009) (footnotes

omitted)).

Appellant initially contends the trial court erred in denying him his

right to self-representation without conducting the requisite colloquy based

"merely" upon his insistence that his mental health examination be recorded and his various legal arguments. Brief for Appellant at 44. However, our review of the record belies this assertion, for the trial court denied Appellant's request to represent himself both based upon his refusal to participate in the mental health evaluation and due to his disruptive and disobedient behavior.

Appellant does not challenge the trial court's order issued following the request of defense counsel for mental health evaluation to assess whether he was competent to represent himself, and we see no error in its decision to assess Appellant's competency before conducting the requisite colloquy to ascertain his understanding of the decision to proceed *pro se*. Indeed, Appellant acknowledges that in **Indiana v. Edwards**, 554 U.S. 164, 128 S.Ct. 2379 (2008), "the Supreme Court held that the mere fact that a defendant may be competent to *stand* trial does not foreclose the possibility that he may not possess sufficient competence to conduct his own defense." Brief for Appellant at 38 (citing **Indiana**, 544 U.S. at 174, 128 S.Ct. at 2386) (emphasis in original). Appellant also quotes the following portion of the **Indiana** decision:

> [T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under **Dusky** [**v. United States**, 362 U.S. 402 (1960),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

Brief for Appellant at 39 (quoting *Indiana*, 544 U.S. at 177-78, 128 S.Ct. at 2387-88 (footnote omitted)).

Appellant contends *Indiana* is inapplicable to his case in that it creates a "narrow exception" to the right of self-representation that applies only when "the defendant is 'seriously mentally ill' and thereby not mentally 'competent' to conduct his own defense…." Brief for Appellant at 40. Appellant concedes the trial court was unable to make a determination regarding his competency because he refused to participate in the psychiatric evaluation, but he maintains his refusal to do so was premised solely on the trial court's denial of his request for the evaluation to be recorded despite the fact that Dr. O'Brien, expressed a clear willingness to go forward with a recorded examination. *Id*.

Notably, Appellant cites to no legal authority in support of his suggestion that the trial court acted outside of its discretion by declining his demand to have the mental health evaluation recorded. Moreover, as stated previously, defense counsel requested the psychiatric evaluation at the outset, and at no point in making that request did defense counsel or Appellant indicate that the latter would participate only if the session were recorded. Instead, Appellant first made this demand in his meeting with Dr. O'Brien, and then he refused to participate when the doctor informed him that his request would have to be "transmit[ted] … to the court[.]" Dr. O'Brien's Mental Health Evaluation Report, 1/16/14, at 2. Therefore, even if we find Appellant's request had been reasonable, it was arguably untimely.

Additionally, the record demonstrates that Appellant told Dr. O'Brien that he wanted the recording made to protect his confidentiality.

Moreover, while Appellant contends that Dr. O'Brien's "obviously favorable first impression" should have been afforded some weight in the court's competency determination, Appellant's Brief at 41, due to Appellant's refusal to cooperate, Dr. O'Brien ultimately was "not able to obtain sufficient information to render an opinion regarding diagnosis or competency to stand trial with any reasonable medical certainty." *See* Dr. O'Brien's Mental Health Evaluation Report, 1/16/14, at 2. The trial court reiterated to Appellant that in order for him to represent himself, he would need to participate in the evaluation to enable the court first to determine his competency, yet Appellant continued to insist, without any explanation, that he would not participate in the evaluation unless it was recorded. Under these circumstances, Appellant has not convinced us that the trial court erred by denying his request to have the evaluation recorded, nor has he demonstrated that the trial court improperly considered that refusal.

In Appellant's next subclaim, he contends that the trial court erred by denying his request to represent himself based on his "allegedly disruptive behavior." Brief for Appellant at 44. In doing so, the trial court cited to *Commonwealth v. Africa*, 466 Pa. 603, 622, 353 A.2d 855, 864 (1976) wherein our Supreme Court recognized the power of the trial court to control a defendant's conduct and warned "[m]isconduct by defendant can result in

waiver of both his right to represent himself and his right to remain in the courtroom during his trial." The **Africa** Court further instructed that:

> Potentially disruptive defendants, like all defendants, have the right to represent themselves if counsel is validly waived. Whenever a defendant seeks to represent himself, and particularly when he may be disruptive, standby counsel should be appointed. The court should explain to the defendant the standards of conduct he will be expected to observe. If the defendant misbehaves, he should be warned that he will be removed from the court, his right to represent himself will be considered waived, and the trial will continue in his absence with standby counsel conducting the defense. If the defendant again misbehaves, these measures should be taken. The defendant must be made to realize that his disruptive tactics will result only in his exclusion from the courtroom. His case will be tried according to law, in an attempt to do justice, whether he cooperates or not.

*Id.* at 864.

Appellant contends his conduct was not nearly as disruptive as the defendants' behavior in **Africa**, which ultimately led to their being bound and gagged, or as that addressed in **Illinois v. Allen**, 397 U.S. 337, 90 S.Ct. 1057 (1970) wherein the defendant, *inter alia*, spoke to the court in an extremely threatening and abusive manner, disregarded the court's warnings to cease his behavior, and invited the court to shackle him and tape his mouth. **Allen**, 397 U.S. at 339-40, 90 S.Ct. at 1059. Appellant stresses that in failing to afford him an opportunity to begin to represent himself, "subject to good behavior during the course of that endeavor" the trial court violated his constitutional rights. Appellant's Brief at 50-51.

As the aforementioned excerpts from the Notes of Testimony reveal, the trial court denied Appellant's request to proceed *pro se* based upon his utter disregard for the authority of the court and its process. Indeed, Appellant understates the severity of his disruptive conduct during this 'test run' opportunity to proceed *pro se*. As discussed in detail *supra*, Appellant continuously and unabatedly interrupted and argued with the trial court, disregarded the court's rulings and warnings to cease his contemptuous behavior, and directed derogatory comments to the judge, the prosecutor, and his defense counsel. He incessantly objected and repeated already ruled-upon arguments and threatened to refuse to participate in the proceedings altogether when the trial court's rulings were unfavorable to him. He ignored the trial court's reasonable attempts to explain its rulings, as well as the court's directives regarding when to speak and when to desist.

Additionally, we cannot ignore the fact that the trial court essentially permitted Appellant to represent himself, with little to no participation by Attorney Ciancaglini, throughout the majority of the December 2013 and February 2014 proceedings. Appellant's behavior when acting on his own behalf at these pretrial proceedings reasonably was considered by the trial court in determining if he was effectively waiving his right to represent himself at trial. While not dispositive of the court's ruling on Appellant's request to proceed *pro se*, the fact that Appellant's disruptive behavior

continued once his jury trial began supports suggests the trial court's concerns were well-founded.[5]

In light of the record, we conclude that Appellant's disobedient and disruptive behavior, in conjunction with his refusal to participate in a mental health evaluation, constituted an effective waiver of his right to represent himself. Thus, he is not entitled to a new trial.

Judgment of sentence affirmed. .

Judge Dubow joins the memorandum.

P.J.E. Bender files a Dissenting Opinion.

_____

[5] Some of Appellant's defiant conduct on the first day of trial included: objecting to the "proceedings as being fraudulent," N.T. Trial, 7/8/14, at 7; demanding to see the "oath of office" of the court," *Id.* at 8; continuously objecting to Attorney Ciancaglini's representing him, claiming he had never seen counsel before, *Id.* at 13-15; reiterating his jurisdictional challenge (this time arguing the court was "acting on admiralty and maritime" jurisdiction), *Id.* at 11; requesting the prosecutor "be sworn," *Id.* at 9; refusing to speak or interact with his counsel, despite repeated efforts by Attorney Ciancaglini, *Id.* at 16; objecting, throughout the proceeding, to comments by the trial court, prosecutor, or Attorney Ciancaglini, *Id.* at 11, 12, 13, 15, 16, 39, 44; and ignoring the court's command to be quiet, instead replying: "I don't have anything to do with this [jury] selection and I don't consent to it or this jury and I do not consent to you." *Id.* at 20. Appellant's contentious behavior continued on the second day of trial at which time, in the presence of the jury, he began repeatedly objecting to comments by his attorney and the trial court, and claimed the court was "violating all the rules and regulations." *Id.* at 6. As a result, the jury had to be excused. *Id.* Appellant then reiterated many of the aforesaid arguments, and the trial court continued to explain to him those objections were overruled. *Id*. at 10-21. When the trial court attempted to quiet Appellant, he persisted, claiming that the court "kidnapped" him and was "holding [him] at gunpoint with the sheriff right here." *Id.* at 9.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/16/2016</u>