J-A18045-16

2016 PA Super 166

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOSHUA CARLOS OVALLES, | |
| Appellant | No. 1585 MDA 2015 |

Appeal from the Judgment of Sentence August 13, 2015
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0002711-2013

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED JULY 25, 2016**

This is an appeal from the judgment of sentence of life imprisonment entered in the Court of Common Pleas of Luzerne County by the Honorable Thomas J. Burke on August 13, 2015, following a bench trial and Appellant's conviction of first-degree murder.[1]  Upon our review of the record, we affirm.

The trial court aptly set forth the relevant facts and procedural history herein as follows:

> On July 7, 2013 at approximately 1:20 a.m., Wilkes-Barre City Police officers were dispatched to the area of 174 South Grant Street, Wilkes-Barre, for a fight in progress with gunshots fired. Officers on the scene discovered the victim, Vaughn Kemp ("Kemp"), lying motionless in the backyard of 174 South Grant

_____

[1] 18 Pa.C.S.A. § 2501.

_____

*Former Justice specially assigned to the Superior Court.

Street. Kemp had two gunshot wounds in his lower back area. Kemp was transported to Geisinger Wyoming Valley Hospital for treatment. On July 7, 2013, at approximately 2:05 a.m., Kemp was pronounced dead. After a post mortem examination, the cause of death was determined to be multiple gunshot wounds, and the manner of death was ruled a homicide.

On July 9, 2013, a number of individuals who were at the scene of the homicide were interviewed by police investigators. One such individual was Erik Rodriguez ("Rodriguez "), a juvenile at that time. Rodriguez identified the shooter as being [Appellant], the defendant in the above-captioned case.

[Appellant] was arrested on July 9, 2013 and charged with one count of Homicide, 18 Pa.C.S.A. § 2501(a). A preliminary hearing was held on August 21, 2013, after which the charge of Homicide was forwarded to the Court of Common Pleas of Luzerne County. [Appellant] was formally arraigned on October 11, 2013. After multiple continuances and following an appeal of a pretrial determination by the Court, a bench trial commenced on Monday, August 10, 2015. Testimony and closing arguments concluded on Wednesday, August 12, 2015. On Thursday, August 13, 2015, the Court rendered a verdict of guilty of Murder of the first degree, and immediately sentenced [Appellant] to life in prison without parole. [Appellant] filed a Notice of Appeal to the Superior Court of Pennsylvania on August 28, 2015. As per the Court's direction, [Appellant] filed a Concise Statement of Errors Complained of on Appeal ("Concise Statement") on October 9, 2015. This Opinion is submitted pursuant to the Court's obligation set for in Pa.R.A.P. 1925(a).

***

At trial, Denzel Kemp-McCarthy ("Kemp-McCarthy"), the brother of the victim Kemp, testified on behalf of the Commonwealth. He stated that he attended a party at 174 South Grant Street into the morning hours of July 7, 2013. (N.T. at 26). He noticed [Appellant], whom he knew as "Jay Crim", in the backyard where the party was being held. (N.T[.] at 27 -28). During the party, Kemp-McCarthy had a conversation with Ramon Duval ("Duval"). (N.T. at 29). After the conversation, Kemp-McCart[h]y drove home and picked up his brother, Kemp, and his cousin, George Johnson, and brought them to the party. (N.T. at 31). Upon returning to the party, Kemp, Duval and a person named Moe (Maurice Richardson) had a brief exchange of words in the middle of the street, resulting in Kemp attempting to throw a punch at Moe, which Kemp-McCarthy prevented.

(N.T. at 35). At that point, a crowd began to gather in the street in front of the residence at 174 South Grant Street and gunshots were fired. (N.T. at 36). After retreating back to the car, Kemp realized his cousin George was still at the party; Kemp returned to get him. (N.T, at 36-37). About ten minutes later, Kemp-McCarthy heard a few more gunshots, and saw people running away from the house. (N.T. at 37). Kemp-McCarthy returned to the backyard where the party was being held, and found his brother (Kemp) lying face down. He immediately realized something was wrong, and called 911. (N.T. at 38).

Ramon Duval[2] testified on behalf of the Commonwealth. He stated that he arrived to the party at 174 South Grant Street between 11:00 and 12:00 on the night of July 6, 2013. (N.T. at 79). He noticed [Appellant], whom he knew as "Jay Crim", at the party, sitting in the backyard on a sofa. (N.T. at 80 -81). Duval also saw Moe on the couch, and approached him. They then went to the front of the house to speak. (N.T. at 82). Kemp approached them while they were at the front of the house, and encouraged Duval to fight with Moe. (N.T. at 84 -85). Numerous people started to fill the street, including [Appellant]. (N.T. at 86-87). Duval was very close to [Appellant] when he saw him fire three or four gunshots toward the sky, causing Duval to run. (N.T. at 87). He also testified that he did not see anyone else with a gun when he was in the street. (N.T. at 87-88).

Rodriguez was called to testify on behalf of the Commonwealth.[3] Rodriguez, who was sixteen in July of 2013, remembered arriving early to the party at 174 South Grant Street to help set up. (N.T. at 105). He testified that [he] saw [Appellant] in the backyard talking with a small group of people. (N.T. at 108). Rodriguez overheard [Appellant] state that he wanted a gun prior to [Appellant] going to the front of the house. (N.T. at 108). Rodriguez testified that he was approximately twenty feet away from [Appellant] in the front of the house when [Appellant] fired three gunshots in the air. (N.T. at 109). Rodriguez testified that he then went to the porch of the residence so that he could see better. (N.T. at 109). At that point, he witnessed Kemp throw a bottle at [Appellant] that

---

[2] Duval, whose native language is Spanish, testified with the assistance of a court-certified, Spanish-English interpreter.  N.T., 8/10/15, at 77-103.
[3] Rodriguez testified through the use of the same interpreter who assisted Duval. N.T., 8/10/15, at 104-139.

missed, hit a car and broke. (N.T. at 111-112). Kemp then ran and tried to duck and hide behind other people. (N.T. at 112 - 113). [Appellant] then took aim at Kemp, and fired two gunshots in the direction of Kemp. (N.T. at 113, 136). Kemp ran along the side of the residence even after he was shot, and [Appellant] fled in a car. (N.T. at 113). Rodriguez was subsequently interviewed by police two days later, on July 9, 2013. (N.T. at 116). Rodriguez testified at trial that he had been untruthful with the police, telling them that he was inside the residence during the shooting. (N.T. at 116). Cross[-]examination of Rodriguez revealed a number of other inconsistencies in his testimony, including an inconsistent description of the clothing worn by [Appellant] on the night of the shooting. (N.T. at 125, 273). Upon being confronted with the inconsistencies in his testimony regarding the clothing worn by the shooter, Rodriguez admitted same, but immediately and confidently stated that it was [Appellant] whom he saw with a gun. (N.T. at 127). He also confirmed having heard "three (shots) up" and "two when he ([Appellant]) shot at him (Kemp) ". (N.T. at 128).

Dr. Gary Ross testified on behalf of the Commonwealth. He was qualified as an expert in the field of forensic pathology, which includes an expertise in bullet trajectory within the human body. (NT. at 161-165). Dr. Ross testified that he conducted an autopsy on the victim which revealed two gunshot wounds to his right-lower back. (NJ. at 167). The bullet that was described as gunshot wound number one was recovered beneath the skin surface of the victim's right chest. (N.T. at 170).[1] Dr. Ross stated that this particular bullet was shot from a distance, and "went from back to front upward through the abdomen and chest of the decedent." (N.T. at 172). He further testified that this particular gunshot wound was lethal, in that it traveled "through his kidney, caused massive bleeding in the abdomen and the peritoneum cavity and retroperitoneum and also went through his lung which caused significant bleeding within the right chest cavity." (N.T. at 173). Dr. Ross stated that gunshot number two was also a distant gunshot wound, and was the lower of the two wounds on the right-upper buttock or lower back. (N.T. at 174). This bullet was removed from the subcutaneous tissue of the victim's left shoulder. (N.T. at 176). This particular bullet went from back to front, upward slightly towards the left. (N.T. at 178). Dr. Ross described it as a lethal gunshot wound which "went through the soft tissue of the abdomen and chest, penetrated the pulmonary artery, which is the main vessel leaving the heart, and it also penetrated the right atrium of the

- 4 -

heart, which is one of the four major chambers of the heart itself, causing a massive amount of bleeding within the chest and resulted in this decedent's death." (N.T. at 177). Dr. Ross testified that based upon his examination, it was his opinion that the assailant was behind the decedent when he fired the shots. (N.T. at 178). He also testified that, based upon the steepness of the trajectory of the bullet, the wounds were consistent with someone who was ducking. (N.T. at 186). He determined that Kemp's cause of the death of was multiple gunshot wounds and that the manner of death was homicide. (N.T. at 178-179).

Corporal Joseph Gober of the Pennsylvania State Police testified on behalf of the Commonwealth. Corporal Gober is a member of the Bureau of Forensic Services, and is a firearm and toolmark examiner with that unit. (N.T. at 188). He was admitted as an expert in the field of firearm and toolmark examination. (N.T. at 191). He testified that he conducted an examination comparison of the two bullets that were recovered from the victim's body, and concluded that the bullets were discharged from the same unknown firearm. (N.T. at 193 -194).

Captain Mark Rockovich testified on behalf of the Commonwealth. Captain Rockovich is employed as the Records Captain of the Luzerne County Correctional Facility. (N.T. at 223). Part of his job duty is to keep the recordings of phone calls between prisoners and visitors. (N.T. at 224). On July 13, 2013, a recording was made between [Appellant] and a visitor. (N.T. at 225). That recording revealed [Appellant] stating to the effect that he could not be charged with murder one, because "murder one is when I planned it out in my head." [Appellant] could also be heard saying, "... I caused the sixth murder in a year ". (see Commonwealth Exhibit #19).

Detective Charles Jensen was called as on cross by the Defendant. Detective Jensen interviewed both Rodriguez and Duval on July 9, 2013 and prepared reports from the interviews. Detective Jensen admitted that the report of the Rodriguez interview made no mention of Rodriguez's use of alcohol and marijuana on the night of the shooting, details that Rodriguez testified to at trial. (N.T. at 267). Jensen's report also failed to include other details that Rodriguez testified to at trial. For instance, there was testimony that at or about the time the initial shots were fired into the air, [Appellant] yelled "West Side," whereupon one or more other individuals yelled "East Side "; that information was not contained in the Jensen report. (N.T. at 268). Also, as set forth above, Rodriguez told Jensen that he

was inside the residence when the shooting took place, which was inconsistent with his trial testimony. (N.T at 269). Detective Jensen also admitted that the interviews of Rodriguez and Duval contained inconsistent accounts as to the clothes being worn by the shooter. (N.T. at 273-276). Detective Jensen also testified to certain suggested deficiencies in his investigation, like a failure to recover the weapon used, failure to find bullets or bullet casings, a failure to search phone records of [Appellant], and a failure to interview Moe until three days prior to trial. (N.T. at 278 -287).

_____

[1] The testimony of Dr. Ross was clear that he could not determine the order of the wounds, but that "forensic pathologists label the wounds one through whatever beginning from the top of the head to the bottom of the feet." (N.T. at 168).

Trial Court Opinion, filed 11/19/15, at 1-7.

In his brief, Appellant presents the following Statement of Questions

Involved:

A.    Whether the [t]rial [c]ourt erred in denying [Appellant's] Motion for a Brady[4] violation in that the Commonwealth withheld evidence that the alleged eyewitness to the crime had admitted to them prior to his testimony that he committed perjury at the [p]reliminary [h]earing?

B.    The Commonwealth committed prosecutorial misconduct in intentionally withholding evidence from the [Appellant] that the alleged eyewitness to the crime had admitted to them prior to his testimony that he committed perjury at the Preliminary Hearing and had intentionally not taken notes or made any written reports of the witness' admissions and change of statement?

_____

[4] Appellant is referencing ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (hereinafter "***Brady***").

C. Whether the evidence was insufficient to convict [Appellant] of First Degree Murder?

Appellant's Brief at 4.

Appellant initially avers the Commonwealth violated **Brady** by failing to disclose that prior to his testifying at trial, Rodriguez essentially admitted to police he had committed perjury at the preliminary hearing. Specifically Appellant contends Rodriguez "indicated prior to trial that he would materially testify completely different from his prior testimony at the [p]reliminary [h]earing and his statement to the police two days after the shooting of Vaughn Kemp." Appellant's Brief at 16. Appellant further maintains this evidence was material to his case since Rodriguez's statement he "witnessed [Appellant] taking two shots at the victim in the pathway and that his description of the shooter's clothing was completely different were material facts that [Appellant] needed in order to investigate Rodriguez' [sic] completely different story." **Id**. Appellant avers the Commonwealth's failure to disclose this evidence and Rodriguez's admission he had been smoking marijuana and had drunk five or six beers, which were exculpatory statements, entitles him to a new trial. **Id**. at 16, 29. We disagree.

The law governing **Brady** violations is well-settled:

> Under **Brady** and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. **See, e.g., Commonwealth v. Hutchinson**, 611 Pa. 280, 25 A.3d 277, 310 (2011). To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the

accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. ***Hutchinson****, supra* (citation omitted). The burden rests with the appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." ***Id.*** (citation omitted). The evidence at issue must have been "material evidence that deprived the defendant of a fair trial." ***Id****.* (citation and emphasis omitted). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Commonwealth v. Paddy****,* 609 Pa. 272, 15 A.3d 431, 450 (2011) (quoting ***Kyles v. Whitley****,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

   ***Brady*** does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses," nor does ***Brady*** require the prosecution to disclose "every fruitless lead" considered during a criminal investigation. ***Id****.* (citation omitted). The duty to disclose is limited to information in the possession of the government bringing the prosecution, and the duty **does** extend to exculpatory evidence in the files of police agencies of the government bringing the prosecution. ***Commonwealth v. Puksar****,* 597 Pa. 240, 951 A.2d 267, 283 (2008); ***Commonwealth v. Lesko****,* 609 Pa. 128, 15 A.3d 345, 370 (2011) (applying ***Kyles****, supra* at 438, 115 S.Ct. 1555). ***Brady*** is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources. ***Commonwealth v. Smith****,* 609 Pa. 605, 17 A.3d 873, 902–03 (2011); ***Paddy****, supra* at 451. ***Brady*** sets forth a limited duty, not a general rule of discovery for criminal cases. ***Paddy****, supra* at 451 (citing ***Weatherford v. Bursey****,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) for the proposition that "there is no generalized constitutional right to discovery in a criminal case, and ***Brady*** did not create one").

***Commonwealth v. Roney***, 622 Pa. 1, 22-24, 79 A.3d 595, 607-08 (2013)

(emphasis in original).

In addition, "for a defendant to be entitled to a new trial based on the prosecution's failure to disclose information relating to a witness's credibility, the defendant must 'demonstrate that the reliability of the witness may well be determinative of his guilt or innocence.'" ***Commonwealth v. Simpson***, 620 Pa. 60, 82, 66 A.3d 253, 266 (2013) (citations omitted).

Herein, Appellant made an oral motion for a mid-trial ***Brady*** hearing to determine "whether or not there [had] been any interviews, notes, recordings, transcriptions of interviews with any witnesses pertaining to exculpatory evidence, which [Appellant] should have been made aware of prior to trial referencing the testimony of Erik Rodriguez but, obviously, not limited to him." N.T., 8/11/15, at 140. At that time, the prosecutor represented the Commonwealth had turned over all documents in its possession, including a report authored by Captain of Detectives Joseph Coffay which it discovered the prior evening had not been provided to the defense after a conversation with Detective Blitzer, who had been reviewing the case file. ***Id***. at 140-41. In response, Appellant maintained that he should have received any notes taken when investigators in the District Attorney's Office spoke to Rodriguez in preparation for trial. ***Id***. at 142-43.

The prosecutor represented that she questioned Mr. Rodriguez in the presence of Detectives Blitzer and Jensen the day before he testified, and the only information that was elicited from Rodriguez was his responses to the questions the prosecutor posed. The prosecutor further stated she

heard Rodriguez say for the first time on cross-examination at trial that Appellant had been wearing a red and gold jacket at the time of the shooting. The Commonwealth had no information in this regard other than the report prepared by Detective Jensen on July 9th and Rodriguez's testimony at the preliminary hearing to the contrary, and Appellant possessed that evidence. *Id*. at 143-44. Further argument centered around the possible existence of additional written notes ensued, after which the trial court permitted Appellant to proceed with a ***Brady*** hearing. *Id*. at 145-151. Defense counsel clarified that the reason for the hearing "is ***just*** to ask the affiants on the case and the Detectives if they prepared a report subsequent to the July 9th report and subsequent to the August preliminary hearing that differed in any way from the materials we received." ***Id***. at 150. (emphasis added).

Detectives testified that no written notes or audio recordings were prepared pertaining to Rodriguez's anticipated trial testimony following July 9, 2013. *Id*. at 152-158. Detective Jenson explained that he typed an official report based upon his handwritten notes following the initial interview with Rodriguez on July 9, 2013, but did not take notes or prepare a supplemental report after speaking with him on Friday August 7, 2015. *Id*. at 152-154. On cross-examination, Detective Jenson acknowledged he and the prosecutor met with Rodriguez during a lunch break on August 10, 2015, the first day of trial, and no written notes or audio recording were prepared

at that time. *Id*. at 154-55. Detective Noone informed the trial court his presence during Rodriguez's trial preparation was only intermittent, and he did not prepare any notes at that time, nor was he aware that anyone else did. In fact, he was not in possession of any supplemental report regarding Rodriguez's testimony that may have been prepared after July 9, 2013. *Id*. at 157. Similarly, Detective Bitzer explained that while he had been present for Rodriguez's interview on August 7, 2015, he neither took notes nor prepared a report memorializing the same and was not in possession of any reports subsequent to that prepared on July 9, 2013. *Id*. at 158-59. Following the *Brady* hearing, the trial court found no violation had occurred and in doing so stated the following on the record:

> **THE COURT:** On the basis of the testimony presented today, it appears to be confirmatory of the Commonwealth's assertion that there were no additional reports compiled, nor any additional notes taken beyond those previously furnished to the Defense Counsel; and, moreover, the [c]ourt notes that it specifically continued to hold the witness in question, Mr. Erik Rodriguez, subject to the arrangements under which he was subpoenaed and presented for trial, such that [Appellant] will have the opportunity to pursue that further as it sees fit.
> Moreover, clearly, [Appellant] had an opportunity to cross[-]examine the witness during the course of the Commonwealth having called Mr. Rodriguez.

N.T., 8/11/15, at 159-160.

In light of the foregoing, we agree with the trial court's finding that Appellant failed to establish the Commonwealth withheld any exculpatory information with respect to Rodriguez. The Commonwealth represented and the Detectives testified that other than the report prepared on July 9, 2013,

of which Appellant had possession, no subsequent written or oral recording memorialized Rodriguez's responses to the prosecution's queries posed in preparation for trial. The prosecutor herself learned for the first time on cross-examination of Rodriguez's inconsistent description of the clothing Appellant wore on the night of the shooting; indeed, the Commonwealth could not have been sure of Rodriguez's trial testimony until he took the witness stand. Importantly, defense counsel admitted he could have interviewed Rodriguez in preparation for trial. N.T., 8/11/15, at 150.

Even assuming, *arguendo*, the Commonwealth did not disclose information that Rodriguez's testimony at trial would likely vary from his representation of what he initially said he had observed on the night of the shooting, Appellant is not entitled to relief. Appellant has not established he was prejudiced by any nondisclosure in this regard and, thus, Appellant has not met his burden for relief under ***Brady***. Arguably, such testimony was not exculpatory for the inconsistencies in Rodriguez's account of the shooting, which the trial court acknowledged and discussed in its Opinion pursuant to Pa.R.A.P. 1925(a), called into question the veracity of the Commonwealth's only eyewitness to the crime, and Appellant took advantage of the opportunity to illuminate this fact through his cross-examination of Rodriguez. Moreover, despite Appellant's bald assertions to the contrary, Rodriguez's verbal responses to the Commonwealth's queries in preparation for trial could not have led to the uncovering of any additional

evidence or potential witnesses other than those of which Appellant had been aware since July of 2013 and whose testimony he would have been free to present at trial. Significantly, despite inconsistencies in his description of Appellant's clothing and his vantage point at the time of the shooting, Rodriguez never wavered in his identification of Appellant as the only individual brandishing and shooting a firearm before Kemp was fatally shot, and the defense presented no contradictory testimony in this regard. Accordingly, we conclude the trial court did not err in finding the Commonwealth did not violate *Brady*, for Appellant has failed to demonstrate that the alleged *Brady* violation so undermined the truth determining process that no reliable adjudication of guilt or innocence could have occurred. *See Commonwealth v. Cam Ly*, 602 Pa. 268, 298, 980 A.2d 61, 78 (2009).

Appellant admits his second claim of prosecutorial misconduct coalesces with his *Brady* claim. Nevertheless, he avers the Commonwealth committed prosecutorial misconduct for its intentional withholding of evidence that Rodriguez admitted prior to testifying that he had committed perjury at the preliminary hearing and for failing to take notes or prepare a written report of Rodriguez's admissions and inconsistent statements. Appellant's Brief at 20-21. Appellant maintains that while *Brady* relates to the failure of the Commonwealth to provide the defense with exculpatory evidence, the Commonwealth also is required to disclose any oral inculpatory

statements under Pa.R.Crim.P. 573(B)(1)(b).[5]  He further suggests, without citation to any authority in support of his claim, that district attorneys and members of law enforcement are under an affirmative duty to memorialize in statements a witness makes in preparation for trial in either written notations or reports.  In support of this position, Appellant speculates in his two-paragraph argument that on August 7, 2015, that:

> Rodriguez now told the Commonwealth that he had lied when he said he ran upstairs after he heard the first shots made by [Appellant] up in the air and did not see [Appellant] shooting at Kemp if his trial testimony is to be believed.  His trial testimony that he only ran to the front porch and saw [Appellant] point his gun at Kemp and shoot is highly inculpatory in that it is the only evidence of anyone seeing [Appellant] shoot at Kemp.  Lastly, the Commonwealth was clearly in possession

---

[5] This statute provides:

**(B) Disclosure by the Commonwealth.**

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

\*\*\*

(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

Pa. R. Crim. P. 573(b)(1)(b).

of the oral statement, though, apparently, no one deemed it relevant to take notes regarding the new statement that Rodriguez had made.

Appellant's Brief at 21-22.

As was discussed **_supra_**, contrary to Appellant's claims, the prosecutor indicated that prior to cross-examination, she was unaware Rodriguez was to offer a different description of the clothing Appellant wore at the time of the murder than that which he had provided at the preliminary hearing, and no documents were prepared thereafter concerning Rodriguez's trial preparation. The prosecutor's representations were corroborated by the testimony of three detectives during a mid-trial **_Brady_** hearing. In addition, the trial court, as the fact-finder, was well aware of the inconsistences in Rodriguez's preliminary hearing and trial testimony, and Appellant thoroughly questioned him on cross-examination. As such, this claim merits no relief.

Finally, Appellant asserts the evidence was insufficient to convict him of first-degree murder. In this regard, Appellant reasons that only Rodriguez's previously undisclosed testimony at trial was presented that he shot the victim, and that "the only uncontradicted evidence was that [Appellant] shot a gun in the air three times at the location where Kemp and Richardson were arguing." Appellant's Brief at 25-26.

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every

element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Slocum*, 86 A.3d 272, 275-76 (Pa.Super. 2014) (quotation and citations omitted).

Section 2502 of the Crimes Code, 18 Pa.C.S.A. § 2502, defines murder of the first degree as follows: **(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. 18 Pa.C.S.A. § 2502 (a). As such, to obtain a conviction of first-degree murder, the Commonwealth must have demonstrated that:

a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Montalvo, M.,* 604 Pa. 386,

986 A.2d 84, 92 (2009) (quoting ***Commonwealth v. Kennedy***, 598 Pa. 621, 959 A.2d 916, 921 (2008)); *accord* 18 Pa.C.S. § 2502(a) & (d) (defining first degree murder as an "intentional killing," which is further defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."). The Commonwealth may prove the specific intent to kill necessary for first[-]degree murder wholly through circumstantial evidence. ***Commonwealth v. Rega***, 593 Pa. 659, 933 A.2d 997, 1009–10 (2007).

***Commonwealth v. Murray***, 623 Pa. 506, 528-29, 83 A.3d 137, 151 (2013).

As indicated ***supra***, Appellant's argument is specific in nature. Rather than challenge the sufficiency of the evidence to support any of the applicable elements of the offense, Appellant contends the evidence was insufficient to prove that he was the shooter. As such, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements of the offense have been met. Rather, we will focus on the specific sufficiency issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator.

This Court has recognized that:

[E]vidence of identification need not be positive and certain to sustain a conviction. ***Commonwealth v. S. Jones***, 954 A.2d 1194, 1197 (Pa.Super. 2008)[.] Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. ***Commonwealth v. Minnis***, 458 A.2d 231, 233–34 (Pa.Super. 1983). Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. ***Id.*** at 234. Given additional evidentiary

- 17 -

circumstances, "any indefiniteness and uncertainty in the identification testimony goes to its weight." ***Id.*** at 233.

***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa.Super. 2011) (*en banc*) (quotation marks omitted).

In finding no merit to Appellant's sufficiency of the evidence claim in its Pa.R.A.P. 1925(a) Opinion, the trial court reasoned as follows:

> Viewing the totality of the evidence presented in light of the sufficiency standard set forth above, the [c]ourt holds that the Commonwealth put forth sufficient evidence to prove beyond a reasonable doubt that Kemp was unlawfully killed by [Appellant] and that the killing was intentional based upon his use of a gun on a vital part of the victim's body. The Court specifically points to the testimony of witnesses Kemp-McCarthy and Duval, who place [Appellant] at the scene, Duval who observed [Appellant] fire gunshots toward the sky, Rodriguez who both witnessed [Appellant] shoot toward the sky and thereafter shoot toward the victim, Dr. Ross who testified that each shot was lethal unto itself, Corporal Gober who testified that both bullets came from the same gun, and [Appellant's] self[-]incriminating statements uttered during a phone conversation as referenced in Commonwealth Exhibit #19.

Trial Court Opinion, filed 11/19/15, at 7-8. Upon our review of the record, we agree with the trial court's reasoning and find no error in this regard; therefore, this claim merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2016

- 18 -