J-A23026-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN M. WHITE | : | |
| | : | |
| Appellant | : | No. 553 WDA 2018 |

Appeal from the Judgment of Sentence February 20, 2018
In the Court of Common Pleas of Crawford County Criminal Division at
No(s):  CP-20-CR-0001110-2016

BEFORE:  BOWES, J., SHOGAN, J., and STABILE, J.

MEMORANDUM BY SHOGAN, J.:                    FILED DECEMBER 04, 2018

Appellant, Jonathan M. White, appeals from the judgment of sentence entered on February 20, 2018, in the Crawford County Court of Common Pleas.  After review, we affirm.

The trial court set forth the relevant factual background of this case as follows:

> The testimony that was presented at trial, taken in the light most favorable to the Commonwealth, is that the Pennsylvania State Police observed a vehicle traveling on [Interstate 79 ("I-79")] [n]orthbound in Crawford County commencing at approximately mile marker 139.1.  The Pennsylvania State Police vehicle was traveling northbound as was [Appellant's] vehicle. The trooper was working a speed enforcement detail with another representative from the State Police, Corporal [John] O'Day, who was located on an overpass of Adamsville Road. Corporal O'Day was running radar while Trooper [Brendan] Burns was in a vehicle stopped on the roadside.  Corporal O'Day would radio speeds and vehicle information to Trooper Burns at which time the trooper would engage in a stop if appropriate.

At approximately 12:06 p.m. Corporal O'Day called out a description of a vehicle identified as a black sedan traveling at [85 miles per hour ("m.p.h.") in a 70 m.p.h.] zone.[1] The direction of travel was noted as I-79 North and, almost immediately thereafter, the vehicle then passed Trooper Burns in the left hand lane. Upon the vehicle passing the trooper he began pursuit and the vehicle continued to travel at a high rate of speed. The trooper eventually caught up with the vehicle after approximately two miles. The suspect vehicle, throughout those two miles, was continuing to travel at a high rate of speed and was identified as a black Volkswagen and later identified as a [Volkswagen] Jetta. The trooper immediately activated his emergency lights and sirens when he was within sight of the vehicle. At that point, the Jetta began traveling at faster speeds and then began weaving in and out of traffic including traveling down the center of the interstate straddling the two lanes. The trooper immediately recognized that the driver was unlikely to bring the vehicle to a stop and he radioed in his pursuit.

The suspect vehicle's speeds increased to the point where the trooper identified operational speeds of his vehicle around 135/140 miles per hour in a 70 m.p.h. zone. The black Volkswagen continued to be operated aggressively, changing lanes back and forth, on and off and over the fog lines, around vehicles on all sides. The vehicle maintained a similar high rate of speed throughout and was interacting so closely with other vehicles that the trooper stayed back in fear of there being a likely crash. Throughout the pursuit the trooper specifically observed the vehicle being operated in a manner that forced other vehicles off the roadway and literally and figuratively pushed vehicles out of the way. Pennsylvania State Police, on multiple occasions throughout the pursuit, attempted intervention methods to try to stop the vehicle, all of which were unsuccessful. At some point during the interaction, the trooper was able to see the registration plate and he identified it as Florida plate which was run through NCIC and came back as a rental vehicle.

At no point in time was the trooper able to see inside of the Jetta to identify how many occupants there were in the vehicle. The vehicle continued at speeds in excess of 100 m.p.h. until

---

[1] The maximum speed limit on Pennsylvania freeways is 70 miles per hour. 75 Pa.C.S. § 3362(a)(1.1).

- 2 -

ultimately the vehicle attempted to exit I-79 North at exit 180, Kearsarge Exit, near the Millcreek Mall in Erie, Pennsylvania.

While on I-79, the Jetta made physical contact with one vehicle. The trooper did not actually recognize the crash occurred, it was reported to 911 by the driver of the car that was struck. The operator of the vehicle that was struck during the high speed chase on I-79 testified at the time of trial that an accident occurred, but could not identify the driver or determine how many people were in the vehicle.

Just after exiting off I-79, the vehicle made contact with another vehicle. The only time the trooper lost sight of the vehicle during pursuit was as the vehicle crested from the highway onto the exit ramp on Interchange Road. When the trooper brought his vehicle up over the crest, he saw the black Volkswagen sitting down the road east of the intersection and a damaged red Subaru where a crash had occurred. Trooper Burns believed that he lost sight of the vehicle for no more than 30 seconds. Both vehicles involved in the crash were stopped on Interchange Road, and the black Volkswagen appeared disabled. The trooper approached the subject vehicle at its final resting place.

All told, the pursuit of the black Volkswagen on I-79 north covered approximately 41 miles with lights and sirens activated the entire time. The vehicle only came to a stop after exiting I-79 and coming in contact with another vehicle. The entire pursuit was recorded on an MVR and played for the jury. The total time of the pursuit was 19 minutes and 45 seconds. The evidence shows that the black Volkswagen covered 41 miles in approximately 20 minutes.

Trooper Burns came upon the disabled Jetta and not knowing the details of who was inside, began to approach on foot. The trooper could see that the driver's side airbag had deployed and was covering the driver's side window so it was impossible to immediately see within the vehicle. The trooper approached and saw there was no one sitting in the driver's seat. There was an individual in the passenger's seat who was extricated from the vehicle by another trooper. The passenger was an adult female named Victoria Pringle.

Immediately after the troopers cleared the vehicle, they began receiving information from bystanders who were

- 3 -

attempting to get the trooper's attention and pointing generally towards Max and Erma's, a restaurant that was over an embankment from where the accident occurred. The trooper explained that there were multiple lanes of travel on Interchange Road and then an embankment leading downhill to the parking lot of Max and Erma's and then the restaurant itself.[1] There was a change in elevation so that Max and Erma's and the parking lot sat below the roadway. According to witnesses who testified about observations made from the Max and Erma's parking lot, they could not see up to the road where the accident occurred. Nonetheless, the bystanders on the highway pointed in the direction of Max and Erma's, so the trooper got back in his vehicle and proceeded towards the Max and Erma's plaza and parking lot area. Other troopers had already begun going in that direction. There was no direct verbal communication with any of the individuals at the location of the accident, but the troopers reacted to the immediate indications from the bystanders. Seeing the vacant driver's seat and the individuals pointing, Trooper Burns deduced that the driver had fled from the vehicle in the direction that the individuals were pointing. Based on these observations, it seemed logical for the troopers to begin an initial search in that vicinity for the driver of the vehicle.

[1] The area in question although located in Erie County would be familiar to many individuals as a matter of common knowledge in Crawford County as it is located near the primary exit to the Millcreek Mall and shopping area. The Court notes that only for purposes of explaining that the specific area in question would likely have been well known to some, if not all, of the jurors from a geographic and topography perspective.

Some of the MVR shows much of the relevant area. As seen on the MVR Trooper Burns drives by several restaurants and into the entrance to the Millcreek Mall and then ultimately arrives in the Max and Erma's parking lot. It is also visible from the MVR that other troopers started to filter towards Max and Erma's in the direction the bystanders had indicated.

As Trooper Burns was coming towards Max and Erma's parking lot, a witness in the parking lot area was speaking to another trooper and provided information about what they had observed. The witness testified at trial that the individual had been seen coming from the guardrail in the vicinity of the accident

- 4 -

on Interchange Road. He was an African American male wearing white pants, a white shirt, and a gray hoodie. He came down the hill and was eventually observed going into the HomeGoods store in the plaza. The distance between the location of the accident and the entrance to the HomeGoods store and the shopping plaza is 200 to 300 yards. The witness indicated the individual was still in the store.

The trooper, along with several other State Police Officers, entered the HomeGoods store scanning the isles looking for someone that matched the description provided by the witness. Trooper Burns quickly identified an individual matching the suspect's description standing in the checkout line. He observed an African American male wearing white pants, white shirt and gray zip up hoodie. From the outset, as a result of the man matching the description, the trooper considered the individual a suspect. Approaching the individual, the Trooper noticed that [Appellant] had several items in his hand waiting in the checkout line. The items were not specifically recalled, but were believed to be a drink or some other small miscellaneous items. The individual standing in the checkout line had fresh dirt marks on the back of his white pants and some blood visible on his hand.

The troopers approached [Appellant] who indicated that he had no idea what was going on. Upon the eventual search of [Appellant], it was noted that he did not have a wallet, identification, or money on him. [Appellant], when asked by the troopers, initially identified himself [as] Jonathan Wright with a date of birth of 9/27/84. The trooper asked [Appellant] to spell his name for clarification and he spelled it W-R-I-G-H-T. Eventually, [Appellant] was taken back to the Pennsylvania State Police Barracks in Meadville and was fingerprinted. The Live Scan System identified [Appellant] as Jonathan White with a date of birth of 9/26/1984. The trooper identified [Appellant] in the courtroom as the same individual that he had detained in the HomeGoods Store.

The individual operating the red Subaru that was struck by the black Jetta noted that the car that hit him came flying from south to north almost like it was in mid-air because it was moving so fast over the crest of the hill. He could not identify any details of the driver or any other individuals in the car.

The witness who observed the happenings from the Max and Erma's parking lot testified that she was leaving Max and Erma's after having lunch. Just as she got into her vehicle she heard a loud crash, but could not actually see anything. She then immediately heard sirens. She considered this odd because she heard sirens so quickly after the crash. She specifically indicated that the area of the crash and the sirens was on Interchange Road above her location [in] the parking lot [of] Max and Erma's. Interchange Road itself was not visible from the parking lot. However, the crash and the sirens caused her to immediately look in the general direction up the hill. She could see up to the guardrail from the parking lot, which was a distance of 20 to 30 feet (with the parking lot being downhill from the guardrail). Looking up immediately after the crash, she saw an African American male jumping over the guardrail and sliding down the hill. She found that odd as she is familiar with the area and familiar with Interchange Road and has never seen anyone coming over the guardrail from that direction. The African American male jumped over the guardrail and came into view within seconds of the sound of the crash. He slid down the hill and then ran towards the shopping plaza. No one else jumped over the guardrail, and she did not observe any other people running in that general area. She described the individual who jumped over the guardrail as having white pants, a white shirt, and a gray zip-up hoodie with tan work boots. As he ran through the parking lot towards the plaza, she saw him again jump over another guardrail and then go down another slope to the plaza. Upon arriving in the vicinity of the plaza where other patrons were shopping, he stopped running and started walking. Making these observations, she called 911 and told them that she had seen the individual go into HomeGoods. While on the phone with 911, the dispatcher requested that she go down to the area where the individual was observed. She then drove to that area and parked in front of HomeGoods. The troopers arrived shortly thereafter and she gestured where she had seen the individual go.

When the troopers brought the African American male out of HomeGoods, they walked by the witness. The trooper looked at her and she nodded her head yes, intending to indicate that the trooper had the man she had seen. At trial she confirmed that the person that she saw jump over the guardrail, slide down the hill, and then go over another guardrail and into HomeGoods was in fact the individual that the troopers had brought out of the HomeGoods store. Throughout her entire time in the parking lot

of Max and Erma's and then when she drove to the area of the HomeGoods store where she waited for the troopers to bring [Appellant] out, the witness never saw anyone else running.

Trial Court Opinion, 5/30/18, at 1-4.

A jury found Appellant guilty of fleeing or attempting to elude police officers, recklessly endangering another person ("REAP"), false identification to law enforcement, and two counts of accidents involving damage to attended vehicles.[2] Following the jury's verdict, the trial court found Appellant guilty of drivers required to be licensed, obedience to traffic-control devices, driving on roadways laned for traffic, following too closely, turning movements and required signals, driving vehicle at safe speed, and careless driving.[3]

On February 20, 2018, the trial court sentenced Appellant to an aggregate term of forty-eight to ninety-six months of incarceration, in addition to restitution, costs, and fines. On February 23, 2018, Appellant filed a post-sentence motion seeking judgment of acquittal on all counts except for false identification to law enforcement. The trial court denied Appellant's post-sentence motion on April 4, 2018. On April 10, 2018, Appellant filed a timely appeal. Both the trial court and Appellant have complied with Pa.R.A.P. 1925.

_____

[2] 75 Pa.C.S. § 3733(a), 18 Pa.C.S. § 2705, 18 Pa.C.S. § 4914, and 75 Pa.C.S. § 3743(a), respectively.

[3] 75 Pa.C.S. §§ 1501(a), 3111(a), 3309(1), 3310(a), 3334(a), 3361, and 3714, respectively.

On appeal, Appellant raises the following issue for this Court's consideration: "Whether there was sufficient evidence to prove Appellant was the driver of the Volkswagen Jetta beyond a reasonable doubt, a necessary element of each Count he was convicted of except for Count 3, False Identification to Law Enforcement?" Appellant's Brief at 4. Thus, Appellant is not challenging any elements of the aforementioned crimes or violations of the motor vehicle code; he is challenging only the sufficiency of the evidence proving his identity as the perpetrator.

We begin our discussion of Appellant's challenge to the sufficiency of the evidence with our standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Thomas, ___ A.3d ___, 2018 PA Super 221, *5 (Pa. Super. filed August 3, 2018) (emphasis added; citation omitted). "As an

appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." Commonwealth v. Vogelsong, 90 A.3d 717, 719 (Pa. Super. 2014). Further, we note, "[C]ircumstantial evidence is reviewed by the same standard as direct evidence—a decision by the trial court will be affirmed so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." Commonwealth v. Bricker, 882 A.2d 1008, 1014 (Pa. Super. 2005) (citation omitted).

It is well settled that:

[e]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

Commonwealth v. Ovalles, 144 A.3d 957, 970 (Pa. Super. 2016) (internal citations and quotation marks omitted). Moreover, although evidence of flight, by itself, is not sufficient to convict an individual of a crime, such evidence is relevant and admissible to establish an inference of guilt. Commonwealth v. Rolan, 964 A.2d 398, 410 (Pa. Super. 2008).

Appellant argues that:

[a]t best, the evidence presented allows the inference that Appellant was in the vehicle and knew of the crimes committed. However, no witnesses could identify Appellant as the driver, how many persons were in the car, where Appellant was seated, or testify that no other persons ran from the vehicle. Based on what

was presented, no fact-finder could determine beyond a reasonable doubt anything other than Appellant was found fleeing from the area of the crime and then attempted to conceal his identity to law enforcement.

Appellant's Brief at 14. After review, we disagree.

In essence, Appellant wanted the jury to disregard the reasonable inferences that flowed from the evidence presented at trial. Appellant's argument on appeal ignores the aforementioned standards, which, among other things, obligate this Court to view the evidence in the light most favorable to the Commonwealth. The record reflects that there was a high-speed police pursuit on I-79. N.T., 1/16/18, at 45. The pursuit covered more than forty miles, and it ended when the fleeing vehicle crashed at the intersection of I-79 and Interchange Road. Id. at 64. When police approached the stopped vehicle, the driver was gone. Id. at 76. Bystanders attracted the attention of police, and they pointed in the direction of a Max and Erma's restaurant that was at the bottom of the embankment from where the crash occurred. Id. Witnesses described the person fleeing the crash as an African-American male wearing white pants, a white shirt, and a gray hooded sweatshirt. Id. at 81, 124. One witness noted that the person who fled the crash scene ran, jumped over the guardrail, and slid down the embankment toward the restaurant. Id. at 125. Troopers at the scene located a man matching the description of the fleeing man at a nearby store standing in line to purchase items. Id. at 83-84. This person's clothing matched the description given to police, and the suspect's clothes had fresh

dirt on them; the suspect also had blood on his hands. Id. at 84. Although this man was standing in the checkout line with a drink and other small items in his hands, it was discovered that the suspect had no means to pay for these items. Id. at 86. This suspect was positively identified as the man who was seen fleeing from the scene of the car crash by an eyewitness, and he was identified as Appellant. Id. at 91, 130.

When the evidence is reviewed in the light most favorable to the Commonwealth as verdict winner, we conclude that it was entirely reasonable for the jury to find that Appellant was the driver of the fleeing vehicle. Accordingly, there was sufficient evidence to support Appellant's convictions, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/4/2018