J-S13036-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EMMANUEL LEATHERBERRY | : | |
| | : | |
| Appellant | : | No. 1189 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 11, 2025
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0004907-2023

BEFORE:  PANELLA, P.J.E., NICHOLS, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED JUNE 4, 2026**

Appellant, Emmanuel Leatherberry, appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas, following his bench trial conviction for two counts of aggravated assault, and one count each of attempted murder, possessing an instrument of crime ("PIC"), persons not to possess firearms, and firearms not to be carried without a license.[1]  We affirm.

The relevant facts and procedural history of this matter are as follows. At the time of the incident, Appellant lived on West Sixth Street, in Chester Pennsylvania, almost directly across from Joe's Bar.  On July 22, 2023, various surveillance cameras recorded a black male, later identified as Appellant, around the area of Sixth and Harwick Streets.  Appellant wore dark gray

_____

[1] 18 Pa.C.S.A. §§ 2702, 901 (related to § 2502), 907, 6105, 6106, respectively.

shorts, a black shirt, black sneakers, white socks, a black skull cap, and a distinctive pair of thick, white, over-ear headphones around his neck. As documented on surveillance footage, at 8:18:29 p.m., Appellant entered Joe's Bar, wearing his white headphones. (*See* N.T. Trial, 2/13/25, at 128-132, Commonwealth's Ex. 8, at 3:30). Appellant spent time in the bar, exchanging hugs and handshakes with patrons, including a man wearing a Yankees cap. (*See id.* at 128-132, Commonwealth's Ex. 8 at 03:30 to 03:42).

Between 08:59:59 and 9:01:14 p.m., Appellant, still wearing his headphones, rode his bicycle around the intersection of Harwick and West Sixth Streets. (*See id.* at 92-94, 109-110, 131-132, Commonwealth's Ex. 9 at 01:11 to 01:22; Ex. 10 at 00:00 to 00:10, 01:14 to 01:21). At 9:01:29 p.m., he pedaled to the side door of the bar to speak with four unidentified individuals. (*See id.* at 92-94, 132-33, Commonwealth's Ex. 9 at 01:22 to 01:32; Ex. 12, at 01:22 to 02:33). At 9:02:35 p.m., Appellant rode back to the corner of Harwick and West Sixth Street near the front entrance of Joe's and spoke with other unidentified individuals for a short time. (*See id.* at 92-94, Commonwealth's Ex. 9 at 02:33 to 03:30; Ex. 10 at 02:51 to 03:34; Ex. 12, at 02:33 to 02:42).

At 9:02:46 p.m., Duran Brown[2] slowly turned his Mercedes onto Harwick Street and rolled past the bar while Appellant was still on his bicycle at the

---

[2] The notes of testimony spell Mr. Brown's name "Deron [phonetic]," the trial court opinion uses "Duran," and certain exhibits use either "Duran" or "Doron." (*See* N.T. Trial, 2/13/25, at 14; Trial Court Opinion, 9/2/25, at 21, Commonwealth's Ex. 17, Ex. 19).

corner. (*See id.* at 140-42, Commonwealth's Ex. 5E-1 to 5E-11, Ex. 9 at 02:50 to 03:00; Ex. 10 at 02:51 to 02:57; Ex. 12 at 02:55 to 03:03). The car then continued to drive towards Seventh Street. (*See id.* at 141-42, Commonwealth's Ex. 12 at 02:55 to 03:03). At 9:03:07 p.m., the car crossed Woodrow Street and stopped in the roadway after passing a pedestrian in a Yankees cap. (*See id.* at 109-110, Commonwealth's Ex. 11, at 02:58 to 03:12). At 9:03:12, the man in the Yankees cap approached the Mercedes and began a conversation with Mr. Brown through the passenger side window. (*See* N.T. Trial, 2/13/25, at 48, 107, 154-57, 171; Commonwealth's Ex. 11 at 03:12 to 05:37; Ex. 17, Ex. 19).

At 9:03:30 p.m., Appellant, on his bicycle, left the corner of West Sixth and Harwick and returned to the side door area of the bar to speak again with the four individuals. (*See id.* at 92-94, Commonwealth's Ex. 9 at 03:30 to 03:41; Ex. 10 at 03:29 to 03:31; Ex.12 at 03:31 to 03:43). At 9:03:41 p.m., Appellant appeared to watch the conversation with Mr. Brown. (*See id.* at 82, 86, Commonwealth's Ex. 9 at 03:42 to 03:43; Ex. 12 at 03:40 to 03:43).

Between 9:03:43 p.m. and 9:04:14 p.m., Appellant dismounted his bicycle and left it in the middle of the sidewalk. (*See id.* at 92-94, Commonwealth's Ex. 9 at 03:43 to 03:47; Ex. 12 at 03:43 to 03:49). At 9:03:47 p.m., Appellant removed his headphones and sprinted towards Sixth Street and his home, which was located near the bar. (*See id.* at 92-94, 131, Commonwealth's Ex. 9 at 03:47 to 03:50; Ex. 10 at 03:48 to 03:52; Ex. 12 at 03:43 to 03:49).

At 09:04:15, Appellant returned from the area of his home and began to proceed along Harwick Street towards Seventh Street, holding something at waist level in his left hand. (*See id.* at 96-97, Commonwealth's Ex. 9 at 04:15 to 04:34; Ex. 10 at 04:16 to 04:24; Ex. 12, at 04:26 to 04:39). Although he was no longer wearing the headphones, his clothing was otherwise identical. (*See id.*) Between 9:04:26 and 9:04:29 p.m., Appellant passed Joe's Bar and spoke, from the street, to one of the individuals waiting there. (*See id.* at 97-99, Commonwealth's Ex. 9 at 04:26 to 04:34; Ex. 12 at 04:30 to 04:34). At 9:04:34 p.m., Appellant continued to walk slowly along Harwick Street toward the Mercedes. (*See id.* at 111-12, Commonwealth's Ex. 9 at 04:33 to 04:34; Ex. 12 at 04:34 to 04:37).

Between 9:04:37 p.m. and 9:04:48 p.m., Appellant passed between two parked cars to cross to the far side of Harwick Street and stand near the intersection. (*See id.* at 98-100, Commonwealth's Ex. 11 at 04:46 to 05:11, Ex. 12 at 04:37 to 04:39). Around this time, the men by the side door, who had been watching the interaction, walked from the sidewalk to the street, where they continued to observe. (*See id.* at 99-100, Commonwealth's Ex. 9 at 04:45 to 05:13, Ex. 12 at 04:48 to 05:11).

Appellant waited at the intersection for short time but, at 9:05:18 p.m., continued to creep forward along the wooden fence on Harwick Street. (*See id.* at 99-101, Commonwealth's Ex. 11 at 05:10 to 05:26). At 9:05:28 p.m., Appellant continued to move slowly along the fence, past Woodrow Street, holding an object in his left hand which appeared to be a gun. (*See id.* at

- 4 -

101-102, Commonwealth's Ex. 11 at 05:27 to 05:50). At 9:05:38 p.m., the man in the Yankees cap began to walk away from the Mercedes and the car began to move slowly towards Seventh Street. (*See id.* at 102-104, 117, Commonwealth's Ex. 11 at 05:37 to 05:41). At 9:05:47 p.m., Appellant approached from the Mercedes from the left and began to chase the car on foot. (*See id.* at 102-104, 117, Commonwealth's Ex. 11 at 05:47 to 05:50).

At 9:05:48 p.m., gunshots rang out, and the Mercedes sped away, making a sharp left and sideswiping a parked car before speeding away. (*See id.* at 88-90, Commonwealth's Ex. 10 at 06:05 to 06:09; Ex. 13 at 00:00 to 00:09). After the shooting, for approximately 10 seconds, Appellant's lower body could be seen moving toward the Mercedes and then running back and forth in the middle of the street. (*See* Commonwealth's Ex. 11 at 05:51 to 05:57).

Later that night, officers responded to a parking lot on West Ninth Street in Chester City, where they discovered a Mercedes with shattered glass and visible bullet holes. During a search, officers recovered a paystub from the glove box bearing the name "Duran H. Brown." Officers received reports that Mr. Brown, who had suffered gunshot wounds as a result of the shooting, was attempting to leave the hospital before being interviewed by police. Detective William Murphy responded and encountered Mr. Brown, with whom he was familiar. Mr. Brown had a bandaged left leg, limped, and seemed reluctant to speak to Detective Murphy.

Following the execution of search warrants at Appellant's home and his

female companion's home, officers recovered pay stubs with Appellant's name and address, as well as articles of clothing consistent with those worn by Appellant on the night of the shooting. The clothing tested positive for gunshot residue. Further, eight fired cartridge casings recovered from the crime scene were later determined to have been fired from the same firearm.

On February 12, 2025, the case proceeded to a bench trial. The Commonwealth presented the testimony of Albert Lattanzi, a Pennsylvania State Police laboratory forensic scientist supervisor and expert in gunshot residue analysis, as well as the testimony of Police Officers Thomas Geromichals, German Savillon, and William Murphy, and Detectives Christopher Karr and Sean Gallagher.

In addition to other evidence introduced by the Commonwealth, which included ballistics, medical records, and surveillance video, Detective Murphy unequivocally identified Appellant as the individual depicted in the video. (*See* N.T. Trial, 2/13/25, at 129, 131-32, Commonwealth's Ex. 8 at 3:30, Ex. 9). Detective Murphy explained that he had known Appellant, who he referred to as "E-Man," for over two decades and had directly interacted with him numerous times. (*See id.* at 130). In the videos used for identification, Appellant's face is clearly visible. (*See id.*)

On February 19, 2025, at the close of trial, the court convicted Appellant of the aforementioned charges. On April 11, 2025, the court sentenced Appellant to an aggregate term of 10 to 20 years of incarceration. On April 15, 2025, Appellant timely filed a post-sentence motion challenging the weight

and sufficiency of the evidence. On April 29, 2025, the court denied Appellant's motion.

On May 7, 2025, Appellant timely filed a notice of appeal. On May 12, 2025, the court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On July 10, 2025, following an extension, Appellant timely complied.

On appeal, Appellant raises the following issue for our review:

> Did the trial court err in its finding that the videos exhibited at trial in totality were legally sufficient for the court's finding of Appellant's guilt beyond a reasonable doubt for the specific element of identification within the crimes charged against Appellant?

(Appellant's Brief at 5).

Appellant challenges the sufficiency of the evidence to prove his identity as the perpetrator. Appellant points out that the videos are of poor quality, grainy and not well-lit. Appellant argues that his identification was based solely on the clothing he was wearing, his beard, his skin color, and his general large-framed build. According to Appellant, the video surveillance footage showed several individuals near the victim's car, running from the scene. Appellant asserts that there was no video of the actual shooting, nor any video evidence of Appellant with a muzzle flash, firearm in hand, or similar evidence to establish Appellant's guilt. As a result, Appellant contends that the Commonwealth relied upon entirely circumstantial evidence to prove its case, and that such evidence was insufficient to identify him as the perpetrator of the crimes. We disagree.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Akeley*, 320 A.3d 106, 110-11 (Pa.Super. 2024) (quoting

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa.Super. 2019)).

"[A] perpetrator's identity may be established with circumstantial evidence." *Commonwealth v. Dunkins*, 229 A.3d 622, 632 (Pa.Super. 2020), *cert. denied*, ___ U.S. ___, 142 S.Ct. 1679, 212 L.Ed.2d 584 (2022). "This Court has recognized that 'evidence of identification need not be positive and certain to sustain a conviction.'" *Id.* (quoting *Commonwealth v.*

*Ovalles*, 144 A.3d 957, 969 (Pa.Super. 2016)).

> Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. ... Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

*Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa.Super. 2011) (*en banc*),

*appeal denied*, 617 Pa. 637, 54 A.3d 348 (2012) (internal citations omitted).

Instantly, the trial court summarized the evidence supporting Appellant's identification as follows:

> … Detective Murphy's identifications of [Appellant] as the individual inside the bar and also outside on the bicycle were without hesitation, as well as unchallenged, and given his [two] decades of directly knowing [Appellant,] most credible. It is relatedly noteworthy regarding his being legally proven the perpetrator of the shooting that [Appellant] was wearing the obviously distinctive white headphones around his neck throughout the various videos just prior to the shooting readily distinguishing him from all other depicted individuals, along with his clothing and other physical features.
>
> [Appellant] is seen on video finally removing the headphones from his neck and carrying them in his hand only after he abruptly abandons his bicycle in the middle of the sidewalk and briskly trots toward his nearby residence. When the same individual, wearing the same grey shorts, the same black t-shirt, the same black cap, the same black New Balance sneakers, with the same physique and facial features quickly reappears only [24] seconds later, without the white headset, is unquestionably the same person whom Detective Murphy repeatedly identified, [Appellant].
>
> Immediately thereafter, [Appellant] is easily seen charted by various surveillance cameras proceeding along Harwick

Street toward the scene of the shooting, lurking about the fence line, eventually running into the driving lanes of Harwick Street towards the victim's Mercedes as it slowly begins moving down Harwick Street from just [past] Woodrow Street toward West Seventh Street, and ultimately moving erratically back and forth in the same area where the fired cartridge casings were found at the same time gunshots were audible, while then disappearing from the shooting scene where he had been captured on video for over an hour.

* * *

In the instant case …. the identification by the testifying law enforcement officer via video footage, along with the other evidence at trial, was sufficient as a matter of law to identify [Appellant] as the shooter. Further buttressing [Appellant] being legally proven in the above-captioned matter as the person who shot Duran H. Bronw, Detective Murphy's video based identifications were grounded on [20] years of face-to-face interactions with [Appellant] ….

Most certainly, when viewed in a light most favorable to the prosecution, the totality of the trial's evidence, both direct and circumstantial, demonstrate as a matter of law that [Appellant] after skulking about the far side of Harwick Street just past Woodrow Street, when the same man in the Yankee's cap with whom he had spoken in Joe's Bar earlier finished his conversation with the victim, moved into the driving lanes of Harwick Street and shot multiple times at Mr. Brown, striking and injuring the victim.

(Trial Court Opinion, at 32-35) (internal citations to the record omitted).

The record supports the trial court's conclusions. Detective Murphy identified Appellant, from surveillance video, as a man that he has known for years. (*See* N.T. Trial, 2/13/25, at 129-32, Commonwealth's Ex. 8 at 3:30, Ex. 9). The surveillance video introduced at trial provided various angles and a chain of timestamps in which a man of Appellant's build, clothing, and other

distinctive identifying features saw Mr. Brown's car, went sprinting towards his home, and upon his return, stalked Mr. Brown's car along the street before firing multiple gunshots and injuring him. Despite Appellant's arguments that there were no muzzle flashes or other proof of gunfire, the surveillance footage shows Appellant approaching Mr. Brown's car at the same time shots rang out audibly. (*See* N.T. Trial, 2/13/15, at 88-90, Commonwealth's Ex. 10 at 06:05 to 06:09; Ex. 13 at 00:00 to 00:09). Additionally, Appellant's clothing later tested positive for gunshot residue. (*See* N.T. Trial, 2/12/25, at 25). Viewed in the light most favorable to the Commonwealth as verdict-winner, we agree with the trial court that the evidence was sufficient to establish Appellant's identity and sustain his convictions. *See Akeley, supra*. *See also Orr, supra*; *Dunkins, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/4/2026

- 11 -