J-S41041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEVON K. MOORE | : | |
| | : | |
| Appellant | : | No. 433 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 5, 2022
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000058-2020

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED:  JANUARY 6, 2023**

Appellant Devon K. Moore appeals *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of York County following his conviction by a jury on the charges of third-degree murder, criminal attempt-first-degree murder, and involuntary manslaughter.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: The Commonwealth charged Appellant with multiple crimes in connection with the shooting death of Solomon Moore ("Solomon").  On October 25, 2021,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c), 901(a), and 2504(a), respectively.

Appellant, who was represented by counsel, proceeded to a jury trial at which numerous witnesses testified.

Specifically, David Lambert ("David") testified that, during the evening of October 25, 2019, he drove his daughter, Starasia David ("Starasia"), and her paramour, Marvin Butler ("Marvin"), to the Fine Wine and Liquor Store. N.T., 10/25-27, 2021, at 124-25. At approximately 10:50 p.m., he drove the pair back to Starasia's house, and as they all began walking into the house, two men, later identified as Solomon and Appellant, crossed the street so that they were on the same side as Starasia's house. *Id.* at 124. However, the men recrossed back to the opposite side of the street momentarily, "put their hoodies on," and then again crossed back to the same side of the street as Starasia's house. *Id.* at 125. David told Starasia and Marvin that "them guys [are] coming back across the street, and they don't look good." *Id.* at 132.

David indicated that, at this point, he was standing on the porch with Starasia while Marvin was standing on the sidewalk. *Id.* at 126. As the men walked closer, David noticed Appellant, who had dark skin and was wearing a dark-colored hoodie, was "adjusting the gun" in his left hoodie pocket area, and David could see "[a]lmost all [of the gun]." *Id.* at 125-26, 132. One of the men said "something" to Starasia as they walked by her; however, they "never looked at her." *Id.* at 126. Rather, the men approached Marvin and stood "face to face" with him. *Id.* at 126, 135.

David testified that gunfire suddenly erupted from the group of men although he was unable to determine who fired the first shot.[2] *Id.* at 127. He saw Appellant "get shot and fall to the ground[,]" and he saw Marvin shooting towards Solomon. *Id.* at 127, 134, 136. In response to the gunshots, David pulled Starasia into the building and, after the gunshots ceased, he went outside. *Id.* He saw Marvin running, Appellant lying on the sidewalk attempting to reload his gun, and Solomon lying dead behind a car. *Id.*

David watched as Appellant spoke on a cell phone and crawled to the front of a car. *Id.* at 128. He observed an extra clip lying on the ground and, fearing that Appellant might begin shooting at him and Starasia, he pulled her towards the back of the building. *Id.* They then left the scene. *Id.*

David testified that, after the shooting, Starasia fled, and he does not know where she is currently living. *Id.* at 131. He noted that, at some point after the shooting, people broke into Starasia's house, and it appeared they had been waiting for her to return. *Id.*

Horace Walton ("Horace") testified he was sitting in a car near Starasia's home during the evening of October 25, 2019. *Id.* at 138. He was playing "loud" music and did not hear any gunshots. *Id.* at 140. However, at approximately 10:50 p.m., a guy "bolted" in front of his car, opened the car

---

[2] David testified that "30, 40 seconds, 50 at the most[,]" passed from when he declared the men were coming back across the street until the shooting occurred. *Id.* at 136.

door, entered the car, and asked Horace to drive him "somewhere." *Id.* Horace drove the man to a nearby restaurant. *Id.*

Tanahsia ("Tanahsia") Wright testified that Appellant is her boyfriend, and she knows Solomon, who was Appellant's cousin. *Id.* at 153, 158. She and Appellant lived together near Starasia's house, and during the evening of October 25, 2019, Appellant left their house. *Id.* at 160-61. Soon thereafter, at approximately 10:52 p.m., she heard sirens. *Id.* at 154. Prior to this, she did not hear any gunshots or "a commotion" in the street. *Id.* Upon hearing the sirens, Tanahsia left her home, and she discovered Appellant had been taken to the hospital while Solomon was dead. *Id.* at 155.

Tanahsia confirmed she has made "approximately 900 plus phone calls" to Appellant in the time since the shooting, and she is still romantically involved with Appellant; however, she denied that they have ever talked about the shooting. *Id.* at 156. She confirmed Appellant never told her he was defending himself when he shot at Marvin. *Id.* at 157. She testified they do not talk about the subject because Appellant "gets depressed" when the shooting is mentioned. *Id.* She admitted Appellant did not want to talk to the police because the shooting was "traumatic" for him. *Id.* at 162.

York City Police Detective Tiffany Pitts ("Detective Pitts") confirmed she reviewed private security footage from a video recorded the night in question. The video reveals Appellant was wearing a dark sweatshirt while Solomon was wearing a white sweatshirt. *Id.* at 169. The video shows that David and

Starasia were standing on the porch while Marvin was standing on the sidewalk when Appellant and Solomon approached Marvin. *Id.* at 170. The video shows "a series of muzzle flashes[.]" *Id.* Specifically, the video shows "the first flash" appears to come from the left arm of Appellant, who is left-handed. *Id.* at 177.

The video then reveals that Solomon and Appellant "go down to the ground" while Marvin "kind of walk[s] out towards the street…between two vehicles[.]" *Id.* at 170. The video depicts Appellant crawling towards the back of a car, and a "reflection on one of the bumpers…indicates…there was a muzzle flash back there," which suggested Appellant was continuing to fire his gun. *Id.* at 177. Soon thereafter, an unidentified person runs into the area, appears to pick up something, runs over to Appellant, and then runs away. *Id.* at 171. Detective Pitts additionally testified that video footage was retrieved from a nearby restaurant for the time in question. The video shows Horace driving up and dropping off Marvin. *Id.* at 179.

Moreover, Detective Pitts testified she attempted to interview Appellant while he was in the hospital; however, Appellant indicated he could not talk because "he was mourning." *Id.* at 351. Appellant never made any statements to the police about the events surrounding the shooting. *Id.* Detective Pitts noted Appellant had a valid license to carry a firearm on the date at issue. *Id.* at 354. She also testified that, as part of the investigation, she examined Appellant's social media and discovered that, in the days prior

to the shooting, Appellant searched for "Flea," which is Marvin's nickname, on Facebook. *Id.* at 364-65.

York City Police Officer Joseph Colahan ("Officer Colahan") testified he was on duty during the evening of October 25, 2019, when he heard a call for shots fired outside of Starasia's house. He and his partner traveled to the scene. While his partner checked on Appellant, who was wounded, and Solomon, who was deceased, Officer Colahan began taping off the scene. *Id.* at 195. Officer Colahan found a handgun, which was a Glock .40 caliber pistol containing a magazine, in the driver's side rear wheel of a Volvo parked directly in the crime scene. *Id.* at 197, 234. Appellant was found shot and lying next to the Volvo by the police. *Id.* at 287. A cell phone was recovered from Appellant. *Id.* at 203. Additionally, money was discovered near Solomon's body. *Id.* Also, a vehicle leased to Appellant was found running and parked in a no parking zone in the middle of the street near the shooting. *Id.* at 198.

Numerous additional York City police officers testified about the investigation. Their testimony revealed eighteen bullet casings, discharged from at least two separate firearms, were recovered from the scene. *Id.* at 199-247, 258, 260. Also, Appellant's clothing, including a black hoodie, which he was wearing at the time of the shooting, was recovered by police from the hospital, where Appellant was treated for two gunshot wounds. *Id.* at 208, 221, 245, 289-90. Appellant's hoodie had several bullet fragments lodged

into the cloth. *Id.* at 245. Allison Laneve, a forensic scientist, testified Appellant's hoodie tested positive for gunshot residue. *Id.* 323-24, 327-41.

Dr. Samuel Land ("Dr. Land"), who is a forensic pathologist, testified he performed an autopsy on Solomon, who suffered gunshot wounds. *Id.* at 308-09. Dr. Land testified, to a reasonable degree of medical certainty, that Solomon died from these gunshot wounds. *Id.* at 313.

At the conclusion of trial, the jury convicted Appellant of the offenses indicated *supra*, and on January 5, 2022, the trial court sentenced Appellant to an aggregate of seven years to fourteen years in prison. Appellant filed a timely counseled post-sentence motion, which the trial court denied on January 18, 2022. Appellant did not file a timely notice of appeal; however, on March 7, 2022, after Appellant filed a counseled petition, the trial court reinstated Appellant's appeal rights *nunc pro tunc* in accordance with the PCRA.[3] On March 8, 2022, Appellant filed a counseled notice of appeal *nunc pro tunc*. All Pa.R.A.P 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

> A. Whether there was sufficient evidence to sustain a conviction for third-degree murder under a theory that Defendant created a chain reaction that led to another person shooting and killing the victim?
> B. Whether there was sufficient evidence to sustain a conviction for involuntary manslaughter?

---

[3] Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.

C. Whether there was sufficient evidence to sustain a conviction for criminal attempt-murder of the first degree?

Appellant's Brief at 4 (suggested answers omitted).

Initially, inasmuch as all of Appellant's claims present challenges to the sufficiency of the evidence, we note this Court's standard of review when considering a challenge to the sufficiency of the evidence requires us to look at the evidence in a light most favorable to the Commonwealth, as verdict winner, and determine whether the evidence presented, actual and/or circumstantial, was sufficient to enable a fact-finder to find every element of the crime charged, beyond a reasonable doubt. *See Commonwealth v. O'Brien*, 939 A.2d 912 (Pa.Super. 2007).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and the circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Id.* at 913–914 (quotation omitted). The finder of fact is free to believe all, some, or none of the evidence presented and is free to determine the credibility of the witnesses. *Commonwealth v. Dailey*, 828 A.2d 356 (Pa.Super. 2003).

Appellant first contends the evidence was insufficient to sustain his conviction for third-degree murder on the following grounds: (1) the Commonwealth failed to prove malice and causation, and (2) the

Commonwealth failed to disprove that Appellant acted in self-defense. In essence, Appellant contends the evidence reveals he was lawfully walking down the street while carrying a licensed firearm when Marvin killed Solomon, who was Appellant's cousin. According to Appellant, he shot at Marvin in self-defense, and since his conduct was not the direct cause of Solomon's death, he cannot be criminally culpable for third-degree murder.

> Pennsylvania retains the common law definition of murder, which is a killing conducted "with malice aforethought." Section 2502 of the Pennsylvania Crimes Code categorizes murder into degrees. Third-degree murder is defined as "all other kinds of murder," *i.e.*, those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree).

*Commonwealth v. Packer*, 641 Pa. 391, 168 A.3d 161, 168 (2017) (citations omitted). *See Commonwealth v. Fisher*, 622 Pa. 366, 80 A.3d 1186, 1195 (2013) ("[T]hird[-]degree murder is not by definition an unintentional killing; it is a malicious killing without proof that the specific result intended from the actions of the killer was the death of the victim.") (citation omitted)).

Malice includes not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness, and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious bodily harm. *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981); *Commonwealth v. Devine*, 26 A.3d 1139, 1146 (Pa.Super. 2011).

As it pertains to causation, the following legal framework governs our review:

> **(a) General rule.**—Conduct is the cause of a result when:
>
> (1) it is an antecedent but for which the result in question would not have occurred; and
>
> (2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.
>
> ***
>
> **(c) Divergence between probable and actual result.**—When recklessly or negligently causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which he should be aware unless:
>
> (1) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or
>
> (2) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a bearing on the liability of the actor or on the gravity of his offense.

18 Pa.C.S.A. § 303 (bold in original).

The Commonwealth must "prove a direct causal relationship between the defendant's acts and the victim's death." *Commonwealth v. Rementer*, 598 A.2d 1300, 1304 (Pa.Super. 1991) (citations, quotation marks, and emphasis omitted). "Put another way, if the fatal result was an unnatural or obscure consequence of the defendant's actions, our sense of justice would prevent us from allowing the result to impact on the defendant's guilt." *Id.*

at 1306-07. "[I]t is well established that the tort theory of causation will not suffice to impose criminal responsibility." *Id.* at 1304.

> [C]ausation-in-fact, the "but for" element of assessing the causal connection, alone will not necessarily determine criminal culpability. If it did, little would distinguish tort liability from criminal liability. Our cases emphasize that a criminal conviction requires "a more direct causal connection" than tort concepts. Thus, not only do we demand that the defendant's conduct actually cause the victim's death in that "it is an antecedent but for which the result in question would not have occurred", we also question, in cases such as the instant one, whether the fatal result was so extraordinary, remote or attenuated that it would be unfair to hold the defendant criminally responsible for it.

*Id.* at 1306 (citations and footnotes omitted).

To establish criminal causation, "the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability." *Commonwealth v. Long*, 624 A.2d 200, 203-04 (Pa.Super. 1993) (citing *Rementer*, 598 A.2d at 1304).

> In *Rementer*, we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer*, 598 A.2d at 1304; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer*, 598 A.2d at 1305, n.3 (quotation omitted). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. *Id.* at 1305.
>
> As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. *Id.* "Criminal responsibility may be properly

- 11 -

assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." *Long*, 624 A.2d [at] 203[.] The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions.

*Commonwealth v. Nunn*, 947 A.2d 756, 760 (Pa.Super. 2008) (citations and quotations omitted).

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence provides ample support for Appellant's conviction of third-degree murder for the shooting death of Solomon. Appellant, in concert with Solomon, put their hoodies on, crossed the street, and directly approached Marvin, who was walking behind David and Starasia after they disembarked from a vehicle. Appellant was visibly carrying a handgun and "adjusting" it as he approached Marvin. N.T., 10/25-27, 2021, at 125-26, 132. David warned Marvin that the two men were approaching, and "they don't look good." *Id.* at 132. Surveillance video depicted gunfire between Appellant and Marvin with the first "flash of light" coming from Appellant's left arm. Trial Court Opinion, filed 5/16/22, at 3 (citation to transcript omitted). Marvin returned fire and, ultimately, Solomon was fatally shot.

We conclude Appellant's actions of engaging in the gunfight demonstrated a recklessness of consequences, and conscious disregard by him of an unjustified and extremely high risk that his actions may cause serious bodily harm. *Young*, *supra*. Thus, the Commonwealth demonstrated

malice. Further, but for Appellant's actions of approaching Marvin and shooting at him, Appellant's cohort, Solomon, would not have been shot by Marvin's return of gunfire. As noted *supra*, Appellant's actions need not be the sole cause of death to establish a causal connection. Rather, Appellant's conduct of crossing the street with his gun visible, approaching Marvin, and shooting at Marvin, thereby prompting the shoot-out, was "a direct and substantial factor in producing [Solomon's] death even though other factors combined with that conduct to achieve the result." *Long*, 624 A.2d at 203. The death of Appellant's cohort, who was unarmed, was a natural and foreseeable consequence of the shoot-out; it does not matter for purposes of causation in a third-degree murder case that Appellant's intended consequence was for Marvin to be shot, and not his cousin, Solomon. Thus, we conclude that both parts of the test for causation were satisfied, and the evidence supports a finding that Appellant caused the death of Solomon for purpose of third-degree murder. *Rementer*, *supra*.

Additionally, we reject Appellant's claim the Commonwealth failed to disprove that Appellant acted in self-defense.

Self-defense is a complete defense to a homicide charge if (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force to prevent such harm; (2) the defendant did not provoke the threat that resulted in the slaying; and (3) the defendant did not violate a duty to retreat. 18 Pa.C.S.A.

- 13 -

§ 505(b)(2); **Commonwealth v. Sepulveda**, 618 Pa. 262, 55 A.3d 1108, 1124 (2012). Where the defendant has introduced evidence of self-defense, the burden is on the Commonwealth to disprove the self-defense claim beyond a reasonable doubt by proving that at least one of those three elements is absent. **Sepulveda**, **supra**, 55 A.3d at 1124.

The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense. **Commonwealth v. Houser**, 610 Pa. 264, 18 A.3d 1128, 1135 (2011). Disbelief of the defendant's testimony, however, is not sufficient to satisfy the Commonwealth's burden to disprove self-defense absent some evidence negating self-defense. **Commonwealth v. Torres**, 564 Pa. 219, 766 A.2d 342, 345 (2001).

Here, we conclude the Commonwealth sufficiently disproved Appellant's claim of self-defense. Specifically, there is no dispute Appellant provoked the threat that resulted in Solomon's slaying when he put on his hoodie, crossed the street with Solomon, approached Marvin while visibly adjusting his handgun, and fired the handgun at him. Further, there is no evidence Appellant attempted to retreat; but rather, he continued the shoot-out with

Marvin while on the street. 18 Pa.C.S.A. § 505(b)(2); *Sepulveda*, *supra*. Thus, there is no merit to Appellant's claim.[4]

Appellant's next claim is the evidence was insufficient to sustain his conviction for involuntary manslaughter. Specifically, he contends the Commonwealth failed to prove he did an unlawful or lawful act in a recklessly or grossly negligent manner, as well as failed to prove a causal connection between his conduct and the death of Solomon.

Section 2504 of the Crimes Code defines involuntary manslaughter as: "[a] person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a). Stated differently, "involuntary manslaughter requires 1) a mental state of either recklessness or gross negligence[,] and 2) a causal nexus between the conduct of the accused and the death of the victim." *Commonwealth v. McCloskey*, 835 A.2d 801, 806 (Pa.Super .2003).

_____

[4] To the extent Appellant raises the defense of imperfect self-defense, we note that, if the Commonwealth proves that the defendant's belief that deadly force was necessary was unreasonable but does not disprove that the defendant genuinely believed that he was in imminent danger that required deadly force and does not disprove either of the other elements of self-defense, the defendant may be found guilty only of voluntary manslaughter under the defense of imperfect self-defense. 18 Pa.C.S.A. § 2503(b); *Sepulveda*, *supra*. As indicated *supra*, we conclude the Commonwealth proved Appellant provoked the attack, which led to Solomon's slaying, and he violated a duty to retreat. Thus, we do not address this issue further.

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3). The term "recklessly," as set forth in Section 302(b)(3), encompasses "gross negligence" for purposes of involuntary manslaughter. *Commonwealth v. Huggins*, 575 Pa. 395, 836 A.2d 862, 868 (2003).

In the case *sub judice*, we conclude the Commonwealth sufficiently proved Appellant did an unlawful or law act in a reckless manner, *i.e.*, consciously disregarded a substantial and unjustifiable risk that a person's death would result from his conduct, when he crossed the street with Solomon (who was unarmed), visibly displayed his handgun, adjusted his handgun as he approached Marvin, and engaged in a shoot-out. *See* 18 Pa.C.S.A. § 302(b)(3). Further, for reasons already discussed *supra*, we reject Appellant's claim that there was no casual nexus between his conduct and the death of Solomon.[5] Accordingly, we conclude the evidence was sufficient to sustain his conviction for involuntary manslaughter.

_____

[5] Moreover, to the extent Appellant contends the Commonwealth failed to disprove Appellant's claim of self-defense as it relates to his conviction for involuntary manslaughter, for the same reasons discussed *supra*, we find no merit to the claim.

In his final claim, Appellant contends the evidence was insufficient to sustain his conviction for criminal attempt to commit first-degree murder.

To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill. *Commonwealth v. Ovalles*, 144 A.3d 957, 969 (Pa.Super. 2016). A person is guilty of attempted murder if he takes a substantial step towards an intentional killing. *Commonwealth v. Wesley*, 860 A.2d 585, 593 (Pa.Super. 2004).

"A person commits an attempt when, with the intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of that crime." 18 Pa.C.S.A. § 901(a).

> "For a defendant to be found guilty of attempted murder, the Commonwealth must establish specific intent to kill." *Commonwealth v. Geathers*, 847 A.2d 730, 734 (Pa.Super.2004). Therefore, "[i]f a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder." *In re R.D.*, 44 A.3d 657, 678 (Pa.Super. 2012). "The Commonwealth may establish the *mens rea* required for first-degree murder, specific intent to kill, solely from circumstantial evidence." *Id.* Further, our Supreme Court has repeatedly determined that "[t]he use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1009 (2007); *see also Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1034 (2007) ("a specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the victim's body.").

*Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa.Super. 2016).

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence was sufficient to sustain Appellant's conviction for criminal attempt to commit first-degree murder. Specifically, the circumstantial evidence reveals Appellant had the specific intent to kill Marvin, and he took a substantial step in this endeavor. Specifically, Appellant, who searched for Marvin on social media in the days before the shoot-out, crossed the street, visibly carried his handgun, adjusted his handgun, approached Marvin, fired a shot at him, and engaged in a shoot-out with him. Thus, we find no merit to Appellant's claim. *See Tucker*, *supra*.

We note that, in developing his sufficiency of the evidence claims, Appellant invites us to reassess the credibility of the testimony offered by the witnesses. Also, in developing his sufficiency claims, he presents the evidence in the light most favorable to him and advances his version of the events. However, under the standard governing our review of sufficiency challenges, an appellate court cannot reweigh the evidence and substitute its judgment for that of the jury, as fact-finder. *See Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa.Super. 2009) (reiterating, "a review of the sufficiency of the evidence does not include an assessment of the credibility of testimony") (citation omitted)). Also, we must view the evidence in the light most favorable to the Commonwealth, as the verdict winner. *O'Brien*, *supra*.

For all of the foregoing reasons, we find no merit to Appellant's claims, and we affirm his judgment of sentence.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/06/2023